EFILED IN OFFICE
CLERK OF STATE COURT
TATTNALL COUNTY, GEORGIA

STSV2025000043
HM
MAR 31, 2025 09:21 PM

*Paige D. Mulligan*
Paige D. Mulligan, Clerk
Tattnall County, Georgia

# IN THE STATE COURT OF TATTNALL COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **TROY CASTLEBERRY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION FILE NO:** |
| **v.** | ) |
| | ) |
| **TYRONE OLIVER, in his individual capacity,** | ) |
| **JAMIE CLARK, in his individual capacity,** | ) |
| **BRIAN ADAMS, in his individual capacity,** | ) |
| **JACOB BEASLEY, in his individual capacity,** | ) |
| **ANDREW MCFARLANE, in his individual capacity,** | ) |
| **MICHAEL SNOWDEN, in his individual capacity,** | ) |
| **Defendant WHITE, in her individual capacity,** | ) |
| **ZECHERIAH JONES, in his individual capacity,** | ) |
| **Correctional Officer WILSON, in his individual capacity,** | ) |
| **CURTIS WHITFIELD, in his individual capacity, and** | ) |
| **GEORGIA DEPARTMENT OF CORRECTIONS.** | ) |
| | ) **Jury Trial** |
| **Defendants.** | ) **Demanded** |

---

## COMPLAINT FOR DAMAGES

COMES NOW Troy Castleberry (hereinafter referred to as "Plaintiff"), and, by and through undersigned counsel, hereby files this Complaint for Damages against Defendant Tyrone Oliver, in his individual capacity, Defendant Jamie Clark, in his individual capacity, Defendant Brian Adams, in his individual capacity,

Defendant Jacob Beasley, in his individual capacity, Defendant Andrew McFarlane in his individual capacity, Defendant Michael Snowden in his individual capacity, Defendant White in her individual capacity, Defendant Zecheriah Jones, in his individual capacity, Defendant Correctional Officer Wilson in his individual capacity, Defendant Curtis Whitfield in his individual capacity, and Defendant Georgia Department of Corrections respectfully showing the Court as follows:

## **Preliminary Statement**

1.

This is a civil action pursuant to 42 U.S.C. §1983 to redress deprivations, under color of state law, of Plaintiff's clearly established civil rights secured by the Eighth and First Amendments to the United States Constitution. Claims are hereby filed pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988 for civil rights violations, unsafe prison conditions, failure to protect, failure to intervene, deliberate indifference, deliberate indifference to serious medical needs, cruel and unusual punishment, excessive force, retaliation, and supervisory liability.

2.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for Correctional Lieutenant's Zecheriah Jones's, Warden Jacob Beasley's, and other Smith State Prison officers' and employees' negligent provision of medical care towards Plaintiff at Smith State Prison arising from an incident which took place on

April 2, 2024. This negligent medical care caused Plaintiff to suffer from prolonged

pain and suffering as well as worsened injuries and delayed recovery.

3.

Claims are also brought pursuant to O.C.G.A. § 50-21-20 et. seq. for

Correctional Officer Wilson's, Correctional Unit Manager Curtis Whitfield's, and

other Smith State Prison officers' and employees' negligent provision of medical

care towards Plaintiff at Smith State Prison arising after an incident which took place

on April 2, 2024. This negligent medical care caused Plaintiff to suffer from

prolonged pain and suffering as well as worsened injuries and delayed recovery.

**Parties**

4.

Plaintiff seeks to recover for claims against Defendants arising under federal

and state law. Plaintiff is a resident of Georgia and consents to the venue of

Tattnall County.

5.

Defendant Tyrone Oliver, at all times relevant to this Complaint, was the

Commissioner of the Georgia Department of Corrections and was acting in the

course and scope of his employment and under color of law. Defendant Tyrone

Oliver, (hereinafter referred to as "Defendant Oliver") is sued herein in his

individual capacity for purposes of his actions and policies and staffing of law

enforcement personnel under his control and supervision and for establishing a

policy or pattern of widespread constitutional deprivations at Georgia prisons,

which includes Smith State Prison.

6.

Defendant Oliver can be served at his place of employment.

7.

Defendant Oliver is a Policy Maker for Georgia prisons, which includes

Smith State Prison.

8.

Defendant Jamie Clark, at all times relevant to this Complaint, was the

Director of Engineering and Construction Services for the Georgia Department of

Corrections and was acting in the course and scope of his employment and under

color of law. Defendant Jamie Clark (hereinafter referred to as "Defendant Clark")

is sued herein in his individual capacity for purposes of his actions and policies and

supervision of the maintenance of dilapidated Georgia prison facilities, which

includes Smith State Prison.

9.

Defendant Clark is a Policy Maker for Georgia prisons, which includes

Smith State Prison.

10.

Defendant Clark can be served at his place of employment.

11.

Defendant Brian Adams, up until February 8, 2023, was the warden of Smith State Prison and was acting in the course and scope of his employment and under the color of law. Defendant Brian Adams, (hereinafter referred to as "Defendant Adams") is sued herein in his individual capacity for purposes of his actions and policies and supervision of law enforcement personnel under his control and for establishing a policy or pattern of widespread constitutional deprivations at Smith State Prison.

12.

Defendant Adams was a Policy Maker for Smith State Prison

13.

Defendant Adams can be served at his residence or place of employment.

14.

Defendant Jacob Beasley, after March 1, 2023, was the warden of Smith State Prison and was acting in the course and scope of his employment and under the color of law. Defendant Jacob Beasley, (hereinafter referred to as "Defendant Beasley") is sued herein in his individual capacity for purposes of his actions and policies and supervision of law enforcement personnel under his control and for establishing a

policy or pattern of widespread constitutional deprivations at Smith State Prison. Defendant Beasley is also sued for his personal participation in the subject incidents.

15.

Defendant Beasley was a Policy Maker for Smith State Prison.

16.

Defendant Beasley can be served at his residence or place of employment.

17.

Smith State Prison receives some form of federal funding.

18.

Defendant Andrew McFarlane (hereinafter referred to as "Defendant McFarlane") was at all relevant times an employee at Smith State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

19.

Defendant McFarlane was the Deputy Warden of Security at Smith State Prison. Defendant McFarlane is sued for his training and supervisory conduct in the operation and management of the Prison as well as his personal participation in the subject incidents.

20.

Defendant McFarlane is a resident of Georgia and can be served at his place of employment or residence.

21.

Defendant Michael Snowden (hereinafter referred to as "Defendant Snowden") was at all relevant times an employee at Smith State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

22.

Defendant Snowden was a Behavioral Health Counselor Supervisor at Smith State Prison and is sued for his personal participation in the subject incidents.

23.

Defendant Snowden is a resident of Georgia and can be served at his place of employment or residence.

24.

Defendant White (hereinafter referred to as "Defendant White") was at all relevant times an employee at Smith State Prison and was acting under color of state law and was acting in the course and scope of her employment at the time the subject incidents occurred.

25.

Defendant White was an Admin Support and/or counselor at Smith State Prison and is sued for her personal participation in the subject incidents.

26.

Defendant White can be served at her place of employment or residence.

27.

Defendant Zecheriah Jones (hereinafter referred to as "Defendant Jones") was at all relevant times an employee at Smith State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

28.

Defendant Jones was a Correctional Lieutenant at Smith State Prison and is sued for his personal participation and supervision in the subject incidents.

29.

Defendant Jones is a resident of Georgia and can be served at his place of employment or residence.

30.

Defendant Correctional Officer Wilson (hereinafter referred to as "Defendant Wilson") was at all relevant times an employee at Smith State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

31.

Defendant Wilson was a Correctional Officer at Smith State Prison and is sued for his personal participation in the subject incidents.

32.

Defendant Wilson is a resident of Georgia and can be served at his place of employment or residence.

33.

Defendant Curtis Whitfield (hereinafter referred to as "Defendant Whitfield") was at all relevant times an employee at Smith State Prison and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incidents occurred.

34.

Defendant Whitfield was a Correctional Unit Manager at Smith State Prison and is sued for his personal participation and supervision in the subject incidents.

35.

Defendant Whitfield is a resident of Georgia and can be served at his place of employment or residence.

36.

Pursuant to O.C.G.A §50-21-23, the State of Georgia waived its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties or employment and shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances.

37.

The State of Georgia's waiver of sovereign immunity applies to the negligence claims in this case.

38.

Defendant Georgia Department of Corrections is the State government entity, which employed Correctional Lieutenant Zecheriah Jones, Warden Jacob Beasley, Detention Officer Wilson, Correctional Unit Manager Curtis Whitfield, and other Smith State Prison officers and employees at the time the subject incidents occurred.

39.

Correctional Lieutenant Zecheriah Jones was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course

and scope of his employment and in the course and scope of his official duties at all relevant times to this Complaint.

40.

Warden Jacob Beasley was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course and scope of his employment and in the course and scope of his official duties at all relevant times to this Complaint.

41.

Correctional Officer Wilson was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course and scope of his employment and in the course and scope of his official duties at all relevant times to this Complaint.

42.

Correctional Unit Manager Curtis Whitfield was a State officer or employee who was acting on behalf of Defendant Georgia Department of Corrections in the course and scope of his employment and in the course and scope of his official duties at all relevant times to this Complaint.

43.

Other Smith State Prison officers and employees were State officers or employees who were acting on behalf of Defendant Georgia Department of

Corrections in the course and scope of their employment and in the course and scope of their official duties at all relevant times to this Complaint.

44.

Defendant Georgia Department of Corrections and the State of Georgia are liable to Plaintiff for the torts of Correctional Lieutenant Zecheriah Jones, Warden Jacob Beasley, Correctional Officer Wilson, Correctional Unit Manager Curtis Whitfield, and other Smith State Prison officers and employees, which were committed in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances.

45.

Defendant GDC may be served as consistent with the Georgia Tort Claims Act.

46.

At all times mentioned in this Complaint, the Defendants acted jointly and in concert with each other. Each Defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other Defendants, but each Defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

## **Jurisdiction & Venue**

47.

Venue is proper in this Court pursuant to O.C.G.A. § 50-21-28 as the tort giving rise to the loss occurred in Tattnall County.

48.

Defendants' conduct under color of state law proximately caused the deprivation of Plaintiff's federally protected rights, injuries, and pain and suffering.

49.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, the 14th and 8th Amendment to the United States Constitution, and relevant Georgia law.

50.

Notice of Claim pursuant to O.C.G.A §50-21-26 has been sufficiently and timely sent in this case. An ante-litem notice sent in this case is attached as Exhibit A.

51.

This action has been brought within 2 years of the subject incidents.

52.

All claims which arise out of the facts and circumstances relating to the commission of the alleged crime committed in this case, the beating and torture of Plaintiff, are tolled by operation of O.C.G.A. §9-3-99 from the date of the

commission of the alleged crime, April 1, 2023, until the prosecution of such crime

or act has become final or otherwise terminated. Upon information and belief, the

prosecution of the beating and torture of Plaintiff has not become final or otherwise

terminated.

53.

This Court has personal jurisdiction over Defendant Oliver.

54.

This Court has personal jurisdiction over Defendant Clark

55.

This Court has personal jurisdiction over Defendant Adams.

56.

This Court has personal jurisdiction over Defendant Beasley.

57.

This Court has personal jurisdiction over Defendant McFarlane.

58.

This Court has personal jurisdiction over Defendant Snowden.

59.

This Court has personal jurisdiction over Defendant White.

60.

This Court has personal jurisdiction over Defendant Jones.

61.

This Court has personal Jurisdiction over Defendant Wilson.

62.

This Court has personal jurisdiction over Defendant Whitfield.

63.

This Court has personal jurisdiction over Defendant Georgia Department of Corrections.

**<u>Facts Related to All Counts</u>**

64.

Plaintiff was in the custody of the Smith State Prison serving a sentence in March and April of 2023.

65.

Plaintiff was supposed to be in the F-2 dorm on the day he was attacked, but he was placed in the F-1 Dorm.

66.

There were at least 4 people who died in Plaintiff's dorm before Plaintiff was placed in it.

67.

There were many violent gang members in the dorm where Plaintiff was placed.

68.

Plaintiff was in F-1 when he was attacked on April 1, 2023, or in the alternative April 2, 2023.

69.

Upon information and belief, on the day of the attack, the entire prison was supposed to be on lockdown, but the prisoners were popping locks and roaming about the prison.

70.

At the time of Plaintiff's attack, there was no officer in the tower over Plaintiff's dorm.

71.

Upon information and belief, when Plaintiff went to F-1, gang members within the prison called gang members within F-1 to attack Plaintiff.

72.

Before the attack, Plaintiff was on the phone with his wife who was going to visit him.

73.

Before the attack, Plaintiff's wife came into the prison twice to see Plaintiff, but Plaintiff's wife was told by Defendant White that Plaintiff refused visitation each time.

74.

Before the attack, when Defendant White came to the dorm that Plaintiff was supposed to be in and did not find him, she simply turned back and told Plaintiff's wife that he refused visitation. She never looked for him or checked up on him.

75.

Just prior to the attack, Plaintiff was on the phone with his wife when he was approached by another inmate who asked him to come to room 114 after he got off the phone.

76.

After Plaintiff got off the phone, he went up to room 114 in the F-1 dorm.

77.

There, he was hit in the back of the head and knocked out.

78.

After Plaintiff was hit in the back of the head, his arms were bound behind his back, and he was mercilessly beaten by a group of inmates.

79.

One of the inmates involved actually filmed the attack with a cellular device and posted it on a social media site.

80.

In the video, one can see multiple men repeatedly beating Plaintiff as he is tied up.

81.

The assailants hit Plaintiff multiple times in the face and neck.

82.

At one point, one of the attackers is not satisfied with the bruises and cuts on Plaintiff's face, so he hit Plaintiff very hard on the face until a huge laceration formed.

83.

After bludgeoning Plaintiff for some time, the attackers turned Plaintiff on his back and repeatedly stab him with a very large makeshift knife.

84.

During this time, no correctional officers came to Plaintiff's aid.

85.

After the attack, Plaintiff was unconscious and suffering from his life-threatening injuries for a couple of days.

86.

The next memory that Plaintiff recalls is that he awoke in room 122 of the F-1 dorm, with intense pain and wounds all over his body.

87.

Despite the brutal and widely publicized nature of the attack, it took around a week for the prison to take Plaintiff to a hospital.

88.

Prison officials failed to conduct sufficient rounds and would just quickly walk by and waive their hand as a way to check on prisoners. This, in part caused Plaintiff to not be discovered.

89.

In fact, in the investigative report Plaintiff received from the Open Records Request, Smith State Prison classifies the attack as not an incident where an inmate incurred "serious injury".

90.

Moreover, the investigative report Plaintiff received from the Open Records Request was sparsely filled out and did not provide any information on who attacked and maimed Plaintiff.

91.

In the investigative report Plaintiff received from the Open Records Request, Smith State Prison listed the timing of Plaintiff's attack as April 2, 2023 at 6:20 AM.

92.

However, in the DOJ report, Plaintiff's attack is listed as happening on April 1, 2023.

93.

In the investigative report Plaintiff received from the Open Records Request, Defendant Jones was the reporting official and he was listed as being directly involved.

94.

Furthermore, in the investigative report Plaintiff received from the Open Records Request, the report was entered on April 6, 2023 by Defendant Jones.

95.

In the investigative report Plaintiff received from the Open Records Request, Defendant Beasley reviewed the report on April 6 2023.

96.

Furthermore, Plaintiff's family notified the GDC and other officials of the attack on Plaintiff multiple times before Plaintiff was taken to the hospital.

97.

On either April 7, 2023, or April 8, 2023, 11Alive reached out to the Georgia Department of Corrections about the video and attack on Plaintiff and received the following statement: "We are currently investigating the incident and the offenders involved."

98.

The video of Plaintiff's attack went viral on social media and received traditional news coverage before Plaintiff was taken to the hospital.

99.

In spite of all the notice and warning of Plaintiff's attack and injuries, Plaintiff was not taken to the hospital until April 10, 2023, which was at least 8 or 9 days after plaintiff was brutally beaten.

100.

In spite of all the notice and warning of Plaintiff's attack and injuries, Plaintiff was not taken to the hospital until April 10, 2023 which was at least 4 days after Defendant Beasley and Defendant Jones discovered Plaintiff and his condition.

101.

Defendant Beasley had the means and the authority to have Plaintiff taken to the hospital.

102.

Defendant Jones had the means and the authority to have Plaintiff taken to the hospital.

103.

When Plaintiff finally was taken to Evans Memorial Hospital, it was revealed he suffered from acute bilateral nose fractures, large acute post-traumatic left orbital medial wall blowout fracture with approximate 1.15 cm extension into the medial fractured left ethmoid air cells, acute approximate 4.5 mm depressed left orbital floor fracture, slightly acute post-traumatic depressed left nasal bone fracture, age indeterminate non-depressed right nasal bone fracture, large left frontal hemosinus and diffuse hemosinus throughout the non-compressed left ethmoid air cells, small hemosinus within the left maxillary sinus, moderate sized remote appearing right orbital medial wall blowout fracture, small acute avulsion fracture deformity of the anterior nasal spine, mild left lateral anterior bony nasal septal deviation, generalized diffuse soft tissue swelling about the left orbital, left nasal and left premaxillary soft tissue region, small acute avulsion fracture deformity of the anterior nasal sinus, ossification of the anterior longitudinal ligament noted at C4-5, C5-6, and C6-7, mild anterior spondylosis noted at C5-6 and C6-7, head trauma, sinus infection, right eye with subconjunctival hemorrhage, anisocoria with left eye larger than right eye, superficial laceration to left cheek, 8 stab wounds of the upper back on the right left, and middle, abrasion and swelling of head area, and tenderness in neck and back.

104.

Such injuries described in the above allegation were serious in nature and required immediate treatment at a hospital.

105.

New injuries associated with the attack continue to be discovered in later appointments and the injuries described above by no means constitute an exhaustive list. Plaintiff will continue to suffer additional injuries associated with the attack in the future.

106.

Plaintiff spent approximately 1 week in the hospital after the attack.

107.

After his visit at Evans Memorial Hospital, Plaintiff was discharged back to Smith State Prison.

108.

Plaintiff was disciplined for the attack on his life and was placed in solitary confinement for a period of 10-11 months.

109.

Defendant Beasley, Defendant McFarlane, Defendant Snowden, Defendant Whitfield, and Defendant Wilson retaliated against Plaintiff during this time.

110.

During Plaintiff's time in solitary confinement, Plaintiff wasn't being fed enough food to support his nutrition, Plaintiff's property was destroyed, Plaintiff was isolated from his family, and Plaintiff's attempts to pursue rehabilitation through the Prison's processes and policies were hindered.

111.

During Plaintiff's time in solitary confinement, he was forced to wash his clothes in the toilet.

112.

During Plaintiff's time in solitary confinement, he wasn't given enough food and his food was cold. Plaintiff's food tray was supposed to have four or five compartments worth of food but many of the compartments did not have any food in them and the compartments that did have food in them were sparingly filled.

113.

During Plaintiff's time in solitary confinement, Plaintiff's food was insufficient because Plaintiff was put on a food restriction as part of his punishment.

114.

During Plaintiff's time in solitary confinement, Defendant Wilson made it hard for Plaintiff to get medical care.

115.

While Plaintiff's eye and stab wounds were supposed to be changed every day, he had to beg Defendant Wilson during the week to get Plaintiff medical help to no avail.

116.

During Plaintiff's time in solitary confinement, Plaintiff asked Defendant Wilson plenty of times if he could get his bandage checked on or changed. In response to these requests, Defendant Wilson denied Plaintiff's eye and bandage medical care plenty of times, saying things like "if they don't come and get you then I ain't going to do nothing extra". This denial of medical care occurred for a period of weeks following Plaintiff's injuries.

117.

On multiple occasions after the attack and while in solitary confinement, Plaintiff asked Defendant Wilson for medical help and for his bandages to be changed, but Plaintiff was denied medical care and told things like "there's nothing wrong with you".

118.

During Plaintiff's time in solitary confinement, Defendant Wilson told the whole dorm that Plaintiff "was famous for dying" and told Plaintiff's attack story in front of the whole dorm in order to expose Plaintiff.

119.

During Plaintiff's time in solitary confinement, if Defendant Wilson was angry at Plaintiff, Defendant Wilson would put feces on Plaintiff's plate when passing through the flap.

120.

During Plaintiff's time in solitary confinement, if Defendant Wilson and Plaintiff had a disagreement, Defendant Wilson would close the cell flap and mace Plaintiff while leaving the flap closed. This occurred multiple times during Plaintiff's solitary confinement.

121.

During Plaintiff's time in solitary confinement, Defendant Wilson's supervisor was Defendant Whitfield and was aware of Defendant Wilson's behavior but did not correct it.

122.

During Plaintiff's time in solitary confinement, Defendant Whitfield even actively participated in the macing of Plaintiff.

123.

During Plaintiff's time in solitary confinement, Plaintiff would also ask Defendant Whitfield for bandage changes but Defendant Whitfield denied those requests.

124.

During Plaintiff's time in solitary confinement, when Plaintiff requested more clothing from Defendant Whitfield, because all Plaintiff was wearing was long johns and a t-shirt, Defendant Whitfield denied those requests.

125.

During Plaintiff's time in solitary confinement, when Defendant Whitfield denied Plaintiff's requests for help, he did so as a result of a "you did this to yourself attitude" and would say things like "I ain't doing nothing to you. I ain't put you in there. I ain't hurt you."

126.

During Plaintiff's time in solitary confinement, when there wasn't enough food on Plaintiff's tray, Defendant Whitfield wouldn't allow Plaintiff to buy more food and this further contributed to Plaintiff's suffering.

127.

Upon information and belief, Plaintiff lost around 70 to 80 pounds while in solitary confinement.

128.

During Plaintiff's time in solitary confinement, during much of this time, Smith State Prison was on lockdown and Plaintiff was not able to bathe normally. Instead, he was forced to bathe in the sink.

129.

Defendant Snowden was the chief counselor, and he as well as Defendant McFarlane and Defendant Beasley put Plaintiff in solitary confinement, restricted Plaintiff's food intake, and hindered Plaintiff's rehabilitative processes.

130.

Plaintiff was trying to get out of solitary confinement, get transferred, and drop his security but Defendant Beasley and Defendant McFarlane made this especially difficult and said things like "Nah you going to stay here".

131.

Upon information and belief, Defendant Beasley and Defendant McFarlane would direct counselors not to come to Plaintiff's door when he needed their services such as using the phone to call his family or lawyer.

132.

Such rehabilitative processes that were hindered included Plaintiff attempting to get out of solitary confinement, receiving a lower security level so that Plaintiff could move to a safer dorm, and moving to a safer prison.

133.

Defendant Snowden isolated Plaintiff and told other counselors that only Defendant Snowden could talk with Plaintiff.

134.

Defendant Snowden made it difficult for Plaintiff to receive medical care and hindered Plaintiff's ability to make grievances.

135.

Defendant Snowden also made it very difficult for Plaintiff to communicate with his lawyers and family members.

136.

When Plaintiff missed doctors' appointments, the prison officials would not reschedule for a very long time due to a shortage of staffing.

137.

Plaintiff's family learned of his attack through the spread of the attack video on social media.

138.

After the attack, Plaintiff's family was denied visitation.

139.

Plaintiff incurred significant medical bills as a result of all of the incidents described above.

140.

The incidents described above caused Plaintiff to suffer physical and mental pain and suffering.

141.

Plaintiff's injuries persisted long after the attack.

142.

After the attack, Plaintiff was told by an eye specialist that his left retina was damaged and needed to undergo surgery. He was almost entirely blind in his left eye.

143.

As of June 8th 2023, Plaintiff lost over 50 pounds and could not breathe out of his left nostril.

144.

As a result of the incidents described above, Plaintiff was experiencing constant headaches, required eye surgery, and was evaluated for his mental health, where he was diagnosed with PTSD among other things.

145.

As a result of the incidents described above, Plaintiff has been concerned about permanently losing his vision, which has caused him much mental anguish.

146.

Plaintiff will continue to suffer physical and mental pain and suffering from these incidents in the future.

147.

Plaintiff will likely require serious future medical care. He may require plastic surgery to correct his deformities and scars.

**Additional Facts Related to Count XIII, Count XIV, and Count XV**

148.

Smith State Prison, a close security facility that can house more than 1,500 inmates, has proven in recent years to be one of the state's more problematic. Six inmates were murdered there in 2021, the most of any Georgia prison that year.

149.

Smith State Prison officials, including Defendant Adams, have come under fire for the mounting violence, free flow of contraband, understaffing, and unsanitary conditions at Smith State Prison. As indicated throughout this Complaint, Plaintiff has suffered as a direct result of these issues.

150.

Defendant Adams was the Warden at Smith State Prison up until February 8, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

151.

Defendant Adams's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

152.

Defendant Beasley was the Warden at Smith State Prison after March 1, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

153.

Defendant Beasley's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

154.

Defendant McFarlane was the Deputy Warden of Security at Smith State Prison at all relevant times to this Complaint and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

155.

Defendant McFarlane was the Deputy Warden of Security at all times relevant to this Complaint and was responsible for overseeing security staff members and managing specific groups of inmates, ensuring security, maintaining a safe environment, and overseeing security protocols within the prison system.

156.

Defendant Adams had been with the Georgia Department of Corrections since 1997, starting as a correctional officer.

157.

Defendant Adams had been Warden at Smith State Prison, one of the state's most dangerous facilities, since October 2019.

158.

Since Defendant Adams took the helm at the prison in 2019, Smith State Prison had experienced a steady decline; Violence had skyrocketed, conditions for inmates inside had deteriorated at an unprecedented rate, assaults on staff had increased with little to no disciplinary action taken against offenders, and staffing for the Smith State Prison remained at an all-time low with some shifts having just one correctional officer to manage all of the dorms alone. Plaintiff suffered as a direct result of these issues as when Plaintiff was attacked, Smith State Prison was short staffed.

159.

On February 8, 2023, the Georgia Bureau of Investigations (hereinafter referred to as "GBI") arrested Defendant Adams on charges that he received cash payments as part of a widespread contraband operation at Smith State Prison.

160.

Defendant Adams was charged with False statements and writings; concealment of facts (O.C.G.A. § 16-10-20), Violation of oath by public officer (O.C.G.A. § 16-10-1), Bribery (O.C.G.A. § 16-10-2), and violations under the RICO Act (O.C.G.A. § 16-14-1).

161.

Upon information and belief, during Defendant Adams's reign over Smith State Prison, he received U.S. currency through a pattern of racketeering activity associated with the Yves Saint Laurent Squad, a smuggling ring operating inside the prison. Such activities led to increases in prison violence and contraband and ultimately led to the attack on Plaintiff.

162.

Upon information and belief, Defendant Adams provided false statements to a GBI special agent in an April 2022 interview when he contended that he had not been solicited or bribed by an inmate during the previous 10 years.

163.

Evidence of this extensive contraband smuggling ring based at the prison was discovered amid a GBI investigation of the murder of 88-year-old Bobby Carlton Kicklighter in Glennville.

164.

Mr. Kicklighter was killed at his home in what has been described as a hit intended for his neighbor, an officer at the prison who reportedly had stood up to contraband smuggling at the facility.

165.

The GBI began looking into the alleged corruption in May 2022, a month after an inmate, Nathan Weekes, and three others were indicted in connection with Kicklighter's slaying.

166.

According to GBI Director Vic Reynolds, "That was actually a hit ordered on a correction officer who was a straight-up, righteous guard who couldn't be bought, couldn't be intimidated, couldn't be threatened,".

167.

The central figure in the alleged murder and contraband smuggling plot was Weekes, 26, a Lithonia resident who entered the prison system in 2021 to serve a 17-year sentence for committing a string of armed robberies in DeKalb County.

168.

The May 2022 indictment accused him of directing an associate on the outside, Christopher Sumlin, who broke into Kicklighter's house and shot the man to death. Sumlin was also an inmate at Smith until he was released on parole in October 2020.

169.

According to the indictment, Weekes was known at Smith as "Kash" or "Da President" of the Yves Saint Laurent Squad, a multimillion-dollar contraband ring operating inside the prison. The indictment described the ring as a criminal

enterprise that worked to move cellphones, drugs, jewelry, designer clothing, cash and other prohibited items into the prison.

170.

Weekes used girlfriends and others on the outside to further his interests. He also bribed and intimidated corrections officers.

171.

The indictment also said that members of the gang were involved in two other murders.

    a. One was the June 2021 murder of former correctional officer Jessica Gerling, who was arrested a year earlier for bringing contraband into the prison;

    b. The other was the January 2021 murder of Jerry Lee Davis, a truck driver who made frequent deliveries to the prison.

172.

The same indictment also shed light on another aggravated assault against a Smith State Prison C.O., and it implicated additional parties who reportedly assisted in the furtherance of the criminal enterprise.

173.

The indictment detailed the multi-million-dollar operation in which inmates were responsible for bringing in designer shoes and clothing, diamond and gold jewelry, drugs, and other items into Smith State Prison.

174.

While Warden Adams approved the purchase of video game consoles and flat screen televisions as rewards for inmates, the Smith State Prison facility itself was seemingly overrun with pests, rodents, and filthy mold and mildew.

175.

Despite the overwhelming amount of evidence, to include photos and videos of the items, the issues continued. Additionally, Adams remained Warden.

176.

The Georgia Department of Correction's lack of action prompted questions from a public concerned with the well-being and safety of the nearby Glennville community. Concerns only escalated as ways the prison has directly impacted the public continue on unaddressed.

177.

Plaintiff was put at constant risk of danger, serious personal injury, and death due to the Prison's crumbling infrastructure, which inmates use to craft makeshift knives, called "shanks," for use as weapons. Such shanks were used in the attack to harm and maim Plaintiff.

178.

During his time at Smith State Prison, Plaintiff saw illegal contraband such as knives and machetes daily.

179.

During his time at Smith State Prison, Plaintiff also witnessed the prison doors being "popped", indicating a lack of safety and the ability of prisoners to freely roam the prison.

180.

At Smith State Prison, weapons came off of lockers, off of walls, and off of beds.

181.

Furthermore, at Smith State Prison, contraband was able to be hidden under the sink and the sides of the sink were dilapidated.

182.

At Smith State Prison, inmates would travel through the walls and through the ceilings. Inmates would go on top of the building through holes in the ceiling in order to smuggle contraband.

183.

Gross deficiencies in Smith State Prison's provision of medical care, caused by Defendant Beasley's and Defendant McFarlane's supervision, exposed Plaintiff

to an increased risk of injury, serious illness, pain and suffering, and death, as Plaintiff did not receive constitutionally adequate medical care for his injuries for several days after he was attacked and did not receive constitutionally adequate medical care for a period of weeks while in solitary confinement.

184.

Defendant Adams, Defendant Beasley, and Defendant McFarlane had actual and constructive knowledge of widespread, constitutional violations occurring at Smith State Prison, including the persistent pattern of inmate-on-inmate violence at the Smith State Prison.

185.

Defendant Adams, Defendant Beasley, and Defendant McFarlane instituted a policy of widespread constitutional deprivations at Smith State Prison resulting in unacceptable and unconstitutional levels of inmate-on-inmate violence.

186.

Defendant Adams, Defendant Beasley, and Defendant McFarlane were aware of the substantial risk of danger the Smith State Prison posed to inmates, but they had been deliberately indifferent to such risks.

187.

Violent acts by incarcerated people against other incarcerated people at Smith State Prison were common and included homicides, stabbings, and sexual abuse.

188.

Killings, stabbings, and assaults were common at Smith State Prison. Plaintiff was a victim of assault and stabbing at Smith State Prison.

189.

Assaults and stabbings with man-made "shanks" were a feature of life at Smith State Prison. Plaintiff was stabbed with a man-made shank at Smith State Prison.

190.

There were at least 17 homicides at Smith State Prison between 2020 and 2023.

191.

Such Smith State Prison homicides include but are not limited to:

   a.  Taylor Harrison Brooks, 26: (died April 10, 2020) multiple stab wounds.

   b.  John Bretleir Reyes Cardona, 24: (April 20, 2020) exsanguination (severe loss of blood) from stab wound to neck.

c. Justin Nathaniel Wilkerson, 25: (Jan. 5, 2021) asphyxia, neck compression. During a hearing at the Georgia Legislature, his mother testified he had mental health diagnoses of schizophrenia and bipolar disorder and previously had been attacked in prison.

d. Desmond Hill, 35: (April 9, 2021) strangulation. According to a family member, the day before his death he call his mother and reported that he was in "the hole" with a cellmate who said he was going to kill him.

e. Hiwatha Abdulcah Hakeem Jr., 26: (April 12, 2021) multiple stab wounds. Incident report shows four other prisoners involved. A lawsuit alleges the four who attacked him had a history of violence toward others and that when he sought medical help after the assault, prison officials failed to provide timely and adequate care.

f. Derrick Dionte Deshun Harvey, 26: (June 25, 2021) stab wound to chest.

g. Christopher Ray Reynolds, 38: (July 1, 2021) blunt and sharp force injuries to head and neck.

h. Christopher Michael Redwine, 45: (Sept. 27, 2021) asphyxia due to manual strangulation.

i. Nathan Michael Mahan, 37: (Oct. 23, 2022) stab wounds

j.  Randy O'Neal Wynn, 54: (March 2, 2023) homicide.

k.  Anthony Joseph Zino III, 71: (2023) asphyxia, neck compression

inflicted by other. The local coroner noted that the body was badly

decomposed and the man likely had been dead for days before being

discovered.

l.  Calvin Darrell Denson Jr., 31: (2023) stab wound to chest. The GDC

said seven inmates were involved in a fight.

m. Shaquan Jahrel Boykins, 31: (2023) blunt impact injuries to head

n.  Justin Tyler Smith, 37: (2023) epidural hematoma (bleeding between

the brain membrane and the skull), blunt force injury to head. The

medical examiner said Smith was punched and fell to the ground,

striking his head.

o.  Quenton G. Mayo, 30: (2023) stab wounds to neck. Incident report

data shows four prisoners involved.

p.  Correctional Officer Robert Danford Clark, 42: (2023) multiple stab

wounds. He was attacked by an inmate.

q.  James Adams Jr., 72: (2023) blunt force trauma to head and neck.

192.

Many other incidents of violence have occurred at Smith State Prison during

this period of time.

193.

Leading up to Plaintiff's attack, Smith State Prison experienced high levels of violence:

a.  On March 6, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The incident involved a make-shift knife. The incident was not forwarded for investigation.

b.  On March 9, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The victim was assaulted by unknown assailants. The incident was not forwarded for investigation.

c.  On March 13, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. This inmate was stabbed by an unknown assailant and the weapon was not recovered. The incident was not forwarded for investigation.

d.  On March 15, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The incident was not forwarded for investigation.

e.  On March 17, 2023, an inmate-on-inmate assault occurred which resulted in serious injury. The incident was not forwarded for investigation.

f.  On March 18, 2023, a fight occurred which resulted in serious injury and outside medical treatment. The fight involved multiple inmates and makeshift weapons. The incident was not forwarded for investigation.

g.  On March 23, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The victim was bleeding about the head and face and was attacked by multiple unknown assailants. The incident was not forwarded for investigation.

h.  On April 1, 2023, an inmate-on-inmate assault occurred resulting in injuries and a hospital transport. The incident was not forwarded for investigation.

i.  On April 1, 2023, an inmate-on-inmate assault occurred resulting in injuries. The assault involved a man-made weapon. The incident was not forwarded for investigation.

j.  On April 2, 2023, an inmate-on-inmate assault occurred which resulted in serious injury and outside medical treatment. The assault

occurred while no guards were around and the attacker's identity is
unknown. The incident was not forwarded for investigation.

k.  On April 7, 2023, an inmate-on-inmate assault occurred which
resulted in serious injury and outside medical treatment. The incident
was not forwarded for investigation.

194.

Inadequate supervision by Defendant Beasley and Defendant McFarlane put
incarcerated people, including Plaintiff, at substantial risks of serious harm from
violence and violated their constitutional rights, especially when other conditions
like easy access to weapons contribute to the danger.

195.

At relevant times herein, due to the supervision of Defendant Beasley and
Defendant McFarlane, Smith State Prison Correctional Officers were rarely present
in the housing units and did not perform adequate security rounds or otherwise
monitor people to prevent harm. These failures led to the attack onto Plaintiff as
there was no guard present in the tower over Plaintiff's dorm during the attack and
improperly conducted security rounds caused Plaintiff to remain undiscovered
while he was unconscious and suffering from life-threatening injuries after the
Attack.

196.

As a result of the understaffing and inadequate supervision of Defendant Beasley and Defendant McFarlane, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents. This led to the attack onto Plaintiff.

197.

Defendant Adams, Defendant Beasley, and Defendant McFarlane are aware of the violence in the Smith State Prison. Yet they have failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts which continue at dangerous levels.

198.

Smith State Prison, due to the supervision, staffing, customs, and practices of Defendant Adams, Defendant Beasley, and Defendant McFarlane, regularly operated without enough security staff to provide appropriate supervision and prevent violence. These failures led to the attack onto Plaintiff.

199.

Violence occurs as a direct result of the understaffing, which was caused by Defendant Beasley and Defendant McFarlane.

200.

Properly conducted well-being checks, referred to as "security rounds" at Smith State Prison, are critical to the safety and security of people incarcerated at Smith State Prison.

201.

During security rounds, officers should verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

202.

Security rounds should occur at irregular intervals, with no more than 60 minutes between rounds.

203.

As a result of Defendant McFarlane's and Defendant Beasley's supervision, security rounds were not properly being conducted at Smith State Prison during and after Plaintiff's attack.

204.

Rather than ensuring the safety, wellbeing, and presence of inmates in their cells, prison staff, as a result of the supervision, custom, policy, and training of Defendant McFarlane and Defendant Beasley, conducted their security rounds in

extremely brief manners by just waiving their hand and yelling to prisoners as they sped by cells.

205.

This manner of conducting security rounds led to the attack on Plaintiff as well as the deficient medical care afterwards because Plaintiff was placed in the wrong dorm without the prison official even knowing or discovering where he was, Plaintiff's attack was able to be videotaped and endure for a long period of time without correctional officers intervening, and Plaintiff was left in his cell for a period of days while unconscious before being discovered by correctional officers.

206.

Smith State Prison's security rounds were also deficient, because the prison used flaps that covered the view of the cells from passing by officers.

207.

During the time of Plaintiff's attack as well as the time following Plaintiff's attack, as a result of the supervision, staffing, customs, and practices of Defendant Beasley and Defendant McFarlane, security rounds were not conducted, and such rounds could have prevented Plaintiff's attack and could have led to quicker medical attention to Plaintiff's injuries.

208.

Defendant Adams, Defendant Beasley, and Defendant McFarlane were aware of chronic short staffing and failures to conduct security rounds during all relevant times to this Complaint.

209.

Poor maintenance and pervasive contraband, caused by the supervision, custom, and direction of Defendant Adams, Defendant Beasley, and Defendant McFarlane contributed to the violence at Smith State Prison, including the violence that Plaintiff was a victim of during the attack.

210.

In fact, Defendant Adams was charged with participating in a smuggling ring operating inside the prison which led to increases in prison violence and contraband.

211.

While Defendant Adams was no longer the warden at the time of Plaintiff's attack, the harms created by his illegal smuggling activity had not been corrected, and this in part caused Plaintiff's attack and injuries.

212.

Poor supervision, prison maintenance, and security practices, caused by the supervision and actions of Defendant Adams, Defendant Beasley, and Defendant

McFarlane contributed to a large amount of contraband, including weapons and drugs, and unsafe facilities. These failures led to the attack onto Plaintiff.

213.

Defendant Adams, Defendant Beasley, and Defendant McFarlane were aware of the danger these conditions pose to incarcerated people but failed to take adequate action to make Smith State Prison safe.

214.

Unmaintained parts of Smith State Prison, caused by the supervision of Defendant Adams, Defendant Beasley, and Defendant McFarlane, jeopardized inmate safety and provided the makeshift weapons for the attack onto Plaintiff.

215.

Due to poor maintenance leadership by Defendant Adams and Defendant Beasley, Smith State Prison itself was a source of dangerous weapons, exposed people to violence, and provided makeshift weapons for the attack onto Plaintiff.

216.

Defendant Adams, Defendant Beasley, and Defendant McFarlane did not take appropriate measures to prevent the movement of contraband, including shanks, into and around the prison. These failures led to the attack onto Plaintiff.

217.

In fact, Defendant Adams was charged with participating in a smuggling ring operating inside the prison which led to increases in prison violence and contraband.

218.

Corrupt staff, such as Defendant Adams and others were also a significant source of contraband at Smith State Prison.

219.

Multiple staff members have been arrested for trafficking contraband into Smith State Prison.

220.

Defendant Adams, Defendant Beasley, and Defendant McFarlane were aware of the dangers caused by the facility's poor condition, including providing materials for weapons.

221.

Poor security practices by Defendant Adams, Defendant Beasley, and Defendant McFarlane contributed to the large amounts of contraband, including shanks, that moved into and about Smith State Prison. These failures led to the attacks onto Plaintiff during the Incident.

222.

Smith State Prison staff, due to the supervision, staffing, customs, and practices of Defendant Beasley and Defendant McFarlane, did not conduct adequate security rounds to identify and remove contraband. These failures led to the attack onto Plaintiff.

223.

Planned housing searches were not conducted with necessary frequency, and searches of incarcerated people, including pat searches, were not conducted appropriately. This custom, practice, and supervision by Defendant Beasley and Defendant McFarlane led to the attack onto Plaintiff.

224.

Significant contraband was being trafficked at Smith State Prison leading up to and directly after the attack onto Plaintiff.

225.

The following is a non-exhaustive list of contraband which was found at Smith State Prison leading up to and after the attack onto Plaintiff:

    a. On January 3, 2023, 1 gray Alcatel cell phone and 4 grams of marijuana were recovered from the common area

    b. On January 4, 2023, one 9 inch make-shift shank, metal object sharpened to a point, was found

c. On January 9, 2023, 13 homemade weapons ranging from 9 inches to 17 inches in size were recovered from the shower area

d. On January 11, 2023, two make-shift shanks, metal objects sharpened to a point, were found

e. On January 12, 2023, one 6 inch make-shift shank, metal object sharpened to a point, and another 11.5 inch shank were found

f. On January 12, 2023, one 10 inch make-shift shank, metal object sharpened to a point, and another 9 inch shank were found

g. On January 12, 2023, one 7 inch make-shift shank, metal object sharpened to a point, and another 8 inch shank were found

h. On January 29, 2023, while patrolling the area outside the prison, Glennville Police Department conducted a traffic stop on a black Nissan Altima. A search was conducted and 06 bundles of unknown contraband and a 9mm semi-automatic handgun were recovered.

i. On February 10, 2023, while conducting a perimeter search around the property, 5 large black trash bags were found.

j. On February 13, 2023, a metal homemade weapon measuring 19.5 inches, sharpened to a point on one end was found

k. On February 19, 2023, 2 homemade weapons measuring approximately 17 inches made of metal sharpened to a point on one

end with torn cloth wrapped around the other end to form a handle
were found

l. On February 19, 2023, 2 homemade weapons measuring
approximately 05 inches made of metal sharpened to a point on one
end and the other wrapped with a torn cloth to form a handle were
found

m. On February 20, 2023, 3 homemade weapons, measuring from 8
inches to 21 inches sharpened to a point with a cloth on the other end
to form a handle were found

n. On March 3, 2023, a weapon (piece of metal) approximately 11
inches, sharpened to a point on one end and a handle on the other end
was found

o. On March 4, 2023, 13 pieces of metal in various sizes were found in a
pipe chase and utility closet

p. On March 13, 2023, a sharpened weapon was found

q. On March 16, 2023, hard contraband was found so much so that the
case is still open to an open investigation

r.  On April 4, 2023, a man-made shank measuring 15 inches and a man-
made shank measuring 6 inches were found.

226.

Smith State Prison, as a result of the supervision, custom, and practices of Defendant Beasley and Defendant McFarlane, had inadequate systems for identifying, investigating, and preventing violence. These failures led to the attack onto Plaintiff.

227.

Given the amount of violence at Smith State Prison, procedures to identify dangerous circumstances and investigate misconduct are critical.

228.

Smith State Prison, as a result of the supervision, custom, and practices of Defendant Adams Defendant Beasley, and Defendant McFarlane did not meaningfully investigate the root causes of violence in the prison. These failures led to the attack onto Plaintiff.

229.

Smith State Prison, as a result of the supervision, custom, and practices of Defendant Adams, Defendant Beasley, and Defendant McFarlane does not use quality investigations to identify dangerous situations and avoid violence. These failures led to the attack onto Plaintiff.

230.

After an incident of serious violence occurs or when correctional staff are alerted to a potential for serious violence, sound correctional practice includes a

thorough investigation to identify the source of the violence, determine what led to the violence or threats, and identify corrective actions. As seen above, many acts of violence were not referred for further investigation.

231.

Corrective actions may include increasing staffing, addressing blind-spots, counseling staff to improve the quality of security rounds, re-balancing the mix of different gangs on a housing zone, and identifying the source of involved contraband.

232.

Without such investigations and corrective actions, staff cannot adequately identify or respond to patterns of violence and prevent it from recurring.

233.

Smith State Prison fails to provide constitutionally adequate medical care to people at the prison. Plaintiff's medical care after the attack as well as while he was in solitary confinement was constitutionally deficient due to these issues.

234.

Gross deficiencies in the prison's provision of medical care, as a result of the supervision, custom, staffing, and practices of Defendant Beasley, exposed incarcerated people to an increased risk of injury, serious illness, pain and suffering, and death. Plaintiff's medical care during and after the attack was

constitutionally deficient due to these issues as well as the lack of staff, and failures to discover Plaintiff's unconscious body for hours and even days.

235.

Unsafe prison conditions, caused by Defendant Adams's, Defendant Beasley's, and Defendant McFarlane's supervision, restricted access to medical care and led to constitutionally deficient care. Plaintiff's medical care during and after the attack was constitutionally deficient due to these issues as he was not taken to the hospital for several days and it took days for staff to discover him.

236.

Smith State Prison, as a result of supervision, custom, staffing, and practices of Defendant Beasley and Defendant McFarlane, fails to provide appropriate medical aid in life-or-death situations. Plaintiff's medical care during and after the attack was constitutionally deficient due to these issues as he was not taken to the hospital for several days and it took days for staff to discover him.

237.

Correctional and medical staff have an obligation to respond to people experiencing medical emergencies in prisons.

238.

When correctional officers encounter an incarcerated person experiencing a medical emergency, they should notify medical staff and provide a basic first-responder level of care.

239.

This includes, as appropriate, starting CPR, applying bandages to wounds, using an automated external defibrillator (AED), administering naloxone, or placing the patient in a recovery position to open the airway. This also includes calling for an ambulance when the incarcerated person's injuries are serious enough.

240.

In Plaintiff's case, he would have needed to go to the hospital by ambulance within hours of being discovered. However, when he was discovered by Prison staff, he was not taken to the hospital for days.

241.

Security and staffing problems, caused by Defendant Beasley and Defendant McFarlane, affect all aspects of healthcare in Smith State Prison, including Plaintiff's healthcare after the attack.

242.

The conditions at Smith State Prison—including high levels of violence, poor supervision, poor management, and an inadequately maintained facility—

unreasonably impeded incarcerated people with serious medical needs from accessing necessary care. Plaintiff's medical care during and after the attack was constitutionally deficient due to these issues.

243.

Defendant Beasley was aware of the inadequate medical care in the Smith State Prison but failed to take reasonable measures to improve care.

244.

Many of these issues stem from Defendant Adams's, Defendant Beasley's, and Defendant McFarlane's failure to provide a reasonably safe facility in which incarcerated people have appropriate access to care.

245.

The constitutional deprivations at Smith State Prison described herein led directly to the attack onto Plaintiff as well as the deficient medical care he received afterwards.

## Additional Facts Related to Count XIV and Count XV

246.

Georgia is the eighth most populous state in the United States and has the fourth-highest state prison population.

247.

The Georgia Department of Corrections (hereinafter referred to as "GDC") incarcerates almost 50,000 people in 34 state-operated prisons and 4 private prisons, ranging in capacity from fewer than 500 to more than 2,500 beds.

248.

More than 32,000 of GDC's population are classified as medium security and more than 11,600 are classified as close security. Smith State Prison is one of GDC's close security prisons.

249.

According to the GDC, persons incarcerated at the "close" security level "are escape risks, have assault histories, and may have detainers for other serious crimes on file," and "require supervision at all times by a correctional officer."

250.

The GDC operates on a $1.2 billion budget.

251.

The GDC's Commissioner is Tyrone Oliver, who took over the role in January 2023, after Timothy Ward, the previous Commissioner, retired.

252.

The Commissioner reports to the State Board of Corrections and the Governor.

253.

Defendant Oliver is responsible for managing a $1.3 billion budget, leading approximately 9,000 employees, and the supervision of nearly 50,000 state offenders. This includes staffing decisions and policies.

254.

At all relevant times, Defendant Clark was responsible for management and oversight of the ECS division, which is responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

255.

The incarcerated population in the Georgia prison system, which includes Smith State Prison, faces a substantial risk of serious harm due to failing systems, particularly security staffing. Plaintiff suffered as a direct result of this.

256.

Staffing levels vary across the prisons, which includes Smith State Prison, with correctional officer (CO) vacancy rates around 50% systemwide and over 70% at ten of the largest facilities.

257.

The average CO vacancy rate at its Georgia prisons, which includes Smith State Prison, was 49.3% in 2021, 56.3% in 2022, and 52.5% in 2023.

258.

At many of Georgia's close-and medium-security prisons, with high levels of violence, CO vacancy rates are even higher.

259.

By December 2023, 18 Georgia prisons had CO vacancy rates over 60%, and 10 of those were over 70%.

260.

The circumstances within Georgia's prisons, which includes Smith State Prison, represent inaction by Defendant Oliver and Defendant Clark to address a growing and changing incarcerated population, aging infrastructure, and years of declining staffing rates. Plaintiff suffered as a direct result of this.

261.

With security staffing at such low levels, caused by Defendant Oliver's staffing practices, violence and criminal activity proliferate in the prisons. Plaintiff was a victim of such violence.

262.

Through the policies, supervision, and practices of Defendant Oliver, Georgia prisons fail to stop and to respond appropriately to homicides, life-threatening and other serious violence, and sexual abuse. Plaintiff was a victim of life-threatening and other serious violence.

263.

Over the six-year period from 2018 through 2023, the GDC reported a total of 142 homicides in its prisons, which includes Smith State Prison, with 48 in the first three years and a 95.8% increase in the latter three years, with 94 homicides.

264.

The rate of homicides in Georgia prisons, which includes Smith State Prison, significantly exceeds the most recent available national data on homicide rates in correctional facilities.

265.

The violence and dysfunction that plagues Georgia Prisons has met the threshold to draw attention from the federal government.

266.

In 2016, the Department of Justice (hereinafter referred to as "DOJ") launched a statewide investigation into whether the Georgia prison system adequately protects incarcerated persons who are LGBTI from sexual abuse by staff and by other incarcerated persons.

267.

In 2021, the DOJ expanded the investigation to include protection of all incarcerated persons at the medium-and close-security-level prisons, which includes Smith State Prison, from violence by other incarcerated persons.

268.

The investigation was conducted jointly by the Special Litigation Section of the Civil Rights Division of the United States Department of Justice and the United States Attorney's Offices for the Northern, Middle, and Southern Districts of Georgia.

269.

As part of the investigation, between 2022 and 2023, DOJ visited 17 Georgia prisons, – about half of the state prisons – representing geographically and demographically diverse areas throughout the state and correctional populations that are the focus of this investigation.

270.

As part of this investigation, the DOJ visited the following prisons in 2022 and 2023: Lee Arrendale State Prison, Ware State Prison, Hays State Prison, Walker State Prison, Calhoun State Prison, Pulaski State Prison, Baldwin State Prison, Georgia Diagnostic and Classification Prison, Macon State Prison, Coastal State Prison, Smith State Prison, Telfair State Prison, Rogers State Prison, Dooly State Prison, Wilcox State Prison, Phillips State Prison, and Augusta State Medical Prison.

271.

The DOJ conducted hundreds of private, one-on-one interviews with incarcerated persons and many more brief conversations while touring the facilities; conducted several dozen interviews with GDC facility staff, investigators, and

executive leadership; conducted additional interviews with local coroners, first responders, prosecutors, and employees from other Georgia state agencies; and reviewed tens of thousands of records from GDC, other Georgia state agencies, and third-party entities such as local coroners, EMS providers, and community stakeholders.

272.

The DOJ also reviewed thousands of additional records, including documents from third parties and stakeholders, court records from third-party cases, historical sources, and public reports.

273.

The DOJ worked with four highly qualified expert consultants in conducting this investigation.

a. One was a former high-level state corrections official with decades of experience working in and running state prisons.

b. One was a former law enforcement official who served in a leadership role in a large county jail system, with expertise in data analysis, policy implementation, and staffing assessments.

c. Two were certified Prison Rape Elimination Act (PREA) auditors with specialized expertise in sexual safety in correctional environments, one of whom served as a former inspector general of a state prison system.

274.

As has Plaintiff, even the DOJ has been through significant difficulties in obtaining documents from the GDC regarding the relevant conditions and acts of violence, including Plaintiff's attack, at Georgia prisons, which includes Smith State Prison:

a.  Shortly after launching the expanded investigation in September 2021, DOJ issued a first request for documents to GDC.

b.  The GDC refused to produce most of the requested materials until mid-2023, after DOJ issued an administrative subpoena and sought and obtained court enforcement of the subpoena.

c.  The GDC also severely limited DOJ's access to its prison facilities and to staff interviews until the district court entered a protective order for the documents DOJ had subpoenaed.

d.  Prior to the court's entry of the protective order, the GDC restricted DOJ's access to areas of the prisons accessible to incarcerated persons and facilitated interviews with incarcerated persons but not with staff.

e.  Even after GDC began to produce the requested records, the DOJ encountered challenges in gathering documents.

f. The GDC ultimately produced records sufficient for DOJ to make findings, but the agency delayed or objected to production of some of the material, including investigation records.

g. The DOJ gave the GDC an opportunity to provide records that could have clarified, corrected, or disputed information from other sources, including interviews of staff and incarcerated persons.

h. Although GDC eventually completed production of documents responsive to the DOJ's first subpoena, which was overseen by a federal court, as of the time of publication of this report, GDC still has not completed production of documents responsive to other requests, including a subsequent subpoena issued in mid-2022 for records related to each of the facilities visited by DOJ.

i. Although GDC ultimately produced over 19,000 records, the process of obtaining records and information from GDC was unnecessarily contentious and lengthy.

275.

Throughout the investigation, the DOJ also sought and obtained information from state entities other than GDC, including the Peace Officer Standards and Training Council (POST), which trains and, in some cases, investigates GDC officers; the Georgia Bureau of Investigation (GBI), which conducts some criminal

investigations involving the prisons; the State Board of Pardons and Paroles, which serves as a reporting entity for sexual abuse allegations; and the Governor's Office of Planning and Budget.

276.

The DOJ also sought and obtained information from third-party sources, which included emergency response companies, local coroners, medical providers, community-based rape crisis centers, legal organizations and law firms representing people in GDC's custody or their survivors, and stakeholders such as community activists, currently and formerly incarcerated people, their loved ones, and current and former employees of GDC.

277.

Through these sources, the DOJ obtained thousands of pages of documents, some of them official GDC documents obtained by third parties via open records requests.

278.

The DOJ also conducted hundreds of interviews with stakeholders in the course of their investigation of Georgia prisons, which includes Smith State Prison.

279.

The DOJ also received more than one thousand letters, emails, and other communications from people who are currently incarcerated in Georgia prisons, as well as their loved ones and grassroots advocates.

280.

On October 1, 2024, the DOJ released its findings for its Investigation of Georgia Prisons (hereinafter referred to as "Report").

281.

In the Report, the DOJ found that the Georgia prison system fails to protect incarcerated people from violence and harm by other incarcerated people in violation of the Eighth Amendment

282.

According to the DOJ in the Report, "The State is deliberately indifferent to these unsafe conditions", and "The State has known about the unsafe conditions for years and has failed to take reasonable measures to address them."

283.

The constitutional violations are exacerbated by serious deficiencies in staffing and supervision caused by Defendant Oliver, physical condition and security of the facilities caused by Defendant Clark, control of weapons and other contraband, and incident reporting, response, and investigations.

284.

According to the DOJ in the Report, "The State of Georgia Fails to Reasonably Protect Incarcerated Persons from Violence".

285.

According to the DOJ in the Report, "GDC allows frequent, pervasive violence in the prisons, resulting in serious bodily harm and, in some cases, death".

286.

According to the DOJ in the Report, "The State continues to run its prisons as it has for years, without taking reasonable measures to change course and improve conditions".

287.

According to the DOJ in the Report, "GDC prisons are unsafe due to aging and inadequately maintained facilities and failure to ensure adequate lock, tool, and key controls."

288.

According to the DOJ in the Report, "GDC's ineffective classification and housing systems expose incarcerated persons to an unreasonable risk of violence".

289.

According to the DOJ in the Report, "GDC fails to control weapons, drugs, and other dangerous contraband in its prisons".

290.

According to the DOJ in the Report, "GDC fails to report and investigate serious incidents of harm and dangerous activities".

291.

According to the DOJ in the Report, "The State is Deliberately Indifferent to the Risk of Harm to Incarcerated Persons".

292.

According to the DOJ in the Report, "After an extensive investigation in Georgia's prisons housing people at the medium- and close-security levels, the Department of Justice (the Department or DOJ) concludes that there is reasonable cause to believe that the State of Georgia and the Georgia Department of Corrections (GDC) violate the Eighth Amendment of the United States Constitution".

293.

According to the DOJ in the report, "GDC fails to provide incarcerated persons housed at the medium-and close-security levels with the constitutionally required minimum of reasonable physical safety."

294.

The DOJ's investigation identified hundreds of serious incidents that highlight the systemic violence and chaos in Georgia prisons, and Georgia's failure to control it.

295.

For example, in one month in 2023, Georgia prisons experienced five homicides at four different prisons, and serious incidents at other facilities.

296.

Violent incidents occur across the Georgia prison system, placing thousands of incarcerated people at substantial risk of serious harm on an ongoing basis.

297.

Within a span of just four days in one case in 2023, two brutal assaults occurred in the same facility, Smith State Prison, one resulting in a man's death. They include:

a. An incarcerated man at Smith was discovered dead, possibly strangled to death by his roommate in a segregated housing unit. The local coroner noted the body was badly decomposed, and the man likely had been dead for over two days.

b. Four days prior, another person was assaulted by multiple incarcerated people inside another housing unit at Smith. A video of the assault was uploaded onto social media, where the victim's family saw it several days later. The video showed an incarcerated man sitting on the floor with his hands tied behind his back before a group of men around him punched, kicked, and stabbed him.[1]

---

[1] This incident is referring to the Attack onto Castleberry, which was referenced in the DOJ report.

298.

The Georgia prison system has become a hub for known criminal activity, endangering other incarcerated persons and the public.

299.

District Attorneys from around the state told DOJ that the proportion of violent crimes originating in the prisons, including homicides, has increased in recent years, straining prosecutorial resources.

300.

In the past six years, hundreds of Georgia prison officers have been arrested on criminal charges arising out of acts committed in or in relation to the prisons, including acts with victims outside of the prisons.

301.

The vast majority were contraband-related arrests, while other charges involved violence, extortion, or sexual assault; gangs with members inside and outside the prisons often played a role.

302.

Dozens more officers have been fired, but not arrested, for misconduct related to contraband.

303.

There are more than 425 cases in which Georgia prison employees have been arrested since 2018 for crimes on the job. Some were charged with brutality, extortion or sexual assault. But most arrests — at least 360 — involved contraband. In at least 25 additional contraband cases, employees were fired but not arrested.

304.

Some of those employees were paid thousands of dollars before they were caught in schemes that went on for months and even years. Those who were prosecuted rarely faced prison time. Some weren't prosecuted at all.

305.

Some of the officers accused of wrongdoing include but are not limited to:

a. In 2021 at Rutledge State Prison, a cellphone seized from an inmate showed a series of payments to a correctional officer, Promise Tucker. When Promise Tucker was confronted by the warden in that case, Tucker admitted she would buy a can of tobacco for $40 and sell it to a prisoner for $500. A pack of Newport cigarettes, she said, could be sold for $200 to $250. When Promise Tucker was asked by the warden how long she'd been smuggling in these items, she said she'd been doing it since she became a cadet 14 months earlier. She resigned in lieu of termination.

b. In 2019, a correctional officer at Calhoun State Prison, Temperess Johnson, was caught attempting to smuggle eight cellphones and a large haul of meth — 2.6 pounds — in a GDC van taking prisoners to medical appointments. She was due to receive $10,000, she told authorities. She was sentenced to five years in federal prison.

c. During a four-month period in 2018, Voltaire Pierre, a correctional officer at Hays State Prison, received $7,000 for bringing in pot, cocaine and meth in noodle soup containers. He was sentenced to more than eight years in federal prison.

d. Over three days in January of 2023, four employees working at four different prisons were charged in contraband cases. Among those caught: the food service director at Central State Prison, who was alleged to have concealed pot and meth inside a bag of chips

e. At Calhoun State Prison, since 2018 at least 19 employees have been caught bringing in contraband.

f. In one case in 2023, a correctional officer was sentenced to 18 months in prison after pleading guilty to her role in the massive drug trafficking network. For at least two years, the investigation found, the inmate helped a prisoner, James Dylon NeSmith, smuggle meth into the prison and distribute it.

g.  At the Georgia Diagnostic and Classification Prison, which includes the state's execution chamber, officer Vera Jackson admitted in 2018 that she was paid to provide a man on death row with information on upcoming shakedowns and on the staff.

h.  At Baldwin State Prison, 22-year-old Natalian Andrews was hired as a correctional officer in 2018, though her previous work experience was as a sales associate at Walmart. Nine months later, she was fired for smuggling in a small amount of marijuana in her bra for a prisoner on his birthday.

i.  Jasmine Nicole Hall had been an officer at Hancock State Prison for just seven months when, in January 2019, she was caught at the entrance with three Aquafina water bottles with the seals broken and the liquid discolored. The bottles were found to contain compartments filled with meth, pot, ecstasy and hydrocodone.

j.  At Baldwin State Prison in 2021, it was discovered that Lt. Tracey Wise had been smuggling papers laced with K-2, a synthetic form of marijuana, for a notorious gang member.

306.

According to T. Wright Barksdale, a Georgia prosecutor whose district includes several prisons, "We have got a chronic, persistent issue in the state of

Georgia of bad apples within the Department of Corrections doing all sorts of things. It's a problem we're dealing with every day,".

307.

Scores of people have been charged or sentenced in high-profile criminal cases arising from illegal conduct by people incarcerated by GDC or by GDC employees that has harmed people inside and outside the prisons.

308.

For example, in February 2023, the Warden of Smith State Prison, Brian Adams, was arrested on Georgia RICO charges for his alleged involvement in an extensive drug-smuggling conspiracy led by a person who was incarcerated at Smith.

309.

In one case in 2023, 23 individuals, including several individuals who were incarcerated at six different Georgia prisons, were charged in a sweeping federal indictment stemming from gang-related crimes committed from inside and outside Georgia prisons, including stabbings and assaults committed at multiple Georgia prisons in 2020; a shooting death in the outside community in Griffin, Georgia, in December 2020; and a home arson in early 2021. In a separate federal indictment the same month, a man incarcerated at Telfair State Prison received a federal sentence of life in prison for his leadership role in a massive, gang-related drug

trafficking conspiracy; a GDC CO also was sentenced in the case, for helping to move contraband into the prison at the incarcerated gang leader's direction.

310.

Plaintiff was put at constant risk of danger, serious personal injury, and death due to the Smith State Prison's crumbling infrastructure, caused by Defendant Clark's maintenance practices, which inmates use to craft makeshift knives, called "shanks," for use as weapons. Such shanks were used in the Incident to harm and maim Plaintiff.

311.

Gross deficiencies in Smith State Prison's provision of medical care, caused by Defendant Oliver's understaffing exposed Plaintiff to an increased risk of injury, serious illness, pain and suffering, and death, as Plaintiff did not receive constitutionally adequate medical care for his injuries for several days after he was attacked and did not receive constitutionally adequate medical care for a period of weeks while in solitary confinement.

312.

Violence in the Georgia prisons, which includes Smith State Prison, has reached a crisis level. Defendant Oliver and Defendant Clark are aware of this.

313.

Violent acts by incarcerated people against other incarcerated people at Georgia Prisons, which includes Smith State Prison, include homicides, stabbings, and sexual abuse. Plaintiff was a victim of stabbing.

314.

Killings, stabbings, and assaults are common at Georgia Prisons, which includes Smith State Prison. Plaintiff was a victim of assault and stabbing at Smith State Prison.

315.

Assaults and stabbings with man-made "shanks" are a feature of life at Georgia Prisons, which includes Smith State Prison. Plaintiff was stabbed with a man-made shank at the Smith State Prison.

316.

Defendant Oliver fails to take appropriate steps to provide reasonable protection from harm to the incarcerated people in custody.

317.

Those incarcerated in Georgia prisons, as well as GDC employees, faced an ongoing substantial risk of serious harm due to the lack of controls and violent conditions in Georgia's prisons, which includes Smith State Prison.

318.

At all relevant times herein, Defendant Oliver failed to provide incarcerated persons, including Plaintiff, housed at the medium-and close-security levels with the constitutionally required minimum of reasonable physical safety.

319.

Defendant Oliver's failure to provide adequate staffing and supervision, to maintain basic correctional operations, and to adequately deter, report, and investigate incidents has created an environment of fear and complacency.

320.

Violence, including sexual assaults, stabbings, beatings, and other brutal violence, is a systemic problem in prisons across the state, which includes Smith State Prison.

321.

As a result of Defendant Oliver's actions, staffing levels at prisons housing people at the medium-and close-security levels, which includes Smith State Prison, are inadequate to protect incarcerated people from harm.

322.

Contraband weapons, illicit drugs, and cellphones are commonplace across Georgia's prisons, which includes Smith State Prison.

323.

Defendant Oliver, the GDC commissioner, acknowledged that contraband is the "driving force" for the violence inside the state's prisons, as well as the violence that spills over into the outside world.

324.

Georgia prison officials allow frequent, pervasive violence in the prisons, including Smith State Prison, resulting in serious bodily harm and, in some cases, death.

325.

The consequences reflect systemic breakdowns in basic correctional practices, including staffing and supervision, security systems, contraband control, physical plant, and housing, which are a result of Defendant Oliver's understaffing practices and Defendant Clark's maintenance failures.

326.

A loss of control over the prisons has set in, with near-constant, life-threatening violence functioning as the norm.

327.

According to the GDC, from 2018 through 2023, 142 people have been killed in Georgia prisons, on the State's watch.

328.

According to GDC mortality reports, in 2018, there were 7 homicides systemwide; in 2019, that number jumped to 13 homicides.

329.

Since then, there have been well over 20 homicides in Georgia prisons every year, with 28 in 2020, 28 in 2021, 31 in 2022, and 35 in 2023, according to GDC data.

330.

The rate of homicides in Georgia prisons significantly exceeds the national average.

331.

The national average homicide rate in state prisons across the country for 2019 was 12 per 100,000 people.

332.

Georgia's rate in 2019 was almost triple, at 34 per 100,000 people, and the numbers of homicides have increased precipitously since then.

333.

Georgia prisons saw an unprecedented 38 homicides in 2023, topping the previous record of 31 the year before.

334.

There were at least 17 homicides at Smith State Prison between 2020 and 2023.

335.

In addition to deaths due to violence in the prisons, including Smith State Prison, other serious and life-threatening incidents are exponentially more frequent.

336.

Assaults with weapons, fights, sexual assaults, and other violent incidents are common at Georgia Prisons, including Smith State Prison.

337.

In interviews at 16 of the 17 Georgia prisons the DOJ visited in 2022 and 2023, which includes Smith State Prison, incarcerated people consistently reported that they have witnessed life-threatening violence, including stabbings, and that weapons are widespread in the prisons.

338.

While GDC incident reports document a longstanding pattern of serious violence inside the prisons, many violent incidents often go unreported when they occur in unsupervised housing units or other areas with inadequate staff supervision.

339.

Based on GDC's records, the levels of reported incidents of violence within the GDC system are consistently high.

340.

From January 2022 through April 2023, there were more than 1,400 reported incidents of violence, including fights, assaults, hostage incidents, and homicides, across the close-security prisons and most of the medium-security prisons, which includes Smith State Prison. Of these incidents, 19.7% involved a weapon, 45.1% resulted in serious injury, and 30.5% resulted in offsite medical treatment

341.

From January 2022 through April 2023, the overall incidence of violence gradually increased across the close-security prisons and most of the medium-security prisons, which includes Smith State Prison.

342.

The numbers in the above two allegations do not capture the full scope of violence within the system because:

    a. First, violent incidents are consistently underreported due to a lack of staff supervision and other factors, causing some incidents never to be reported at all

    b. Second, violent incidents are often mischaracterized using inappropriate incident-type categories, resulting in under-counting of violent incidents such as assaults and fights. Such occurred in Plaintiff's case.

343.

In 2021, the highest number of homicides at any one prison occurred at Smith State Prison.

344.

In 2023, seven incarcerated people and one CO were killed in homicides at Smith State Prison.

345.

In June 2024, an incarcerated person at Smith State Prison used a contraband gun to kill a food-service worker and then take his own life.

346.

Examples of homicides at Georgia facilities, which includes Smith State Prison, include, but are not limited to:

    a. Eddie Gosier, 39; May 2, 2020, ligature strangulation. He died just hours after an inmate with a particularly violent history was moved by guards into his cell. Gosier's killer, Daniel Luke Ferguson, had previously strangled to death an inmate at Hays State Prison after being sentenced to life in prison when he was 18 for the shooting death of a neighbor in Walton County.

    b. Terry Lee Bennett II, 43; Jan. 10, 2021, blunt impact to the head

    c. Ali Lamont Tanner, 45; July 2, 2021, stabbed

d.  William Taylor Bodge, 61; Feb. 5, 2022, delayed complications of blunt force injuries

e.  Raphael Zachery Milligan, 41; July 21, 2022, blunt force injuries and strangulation

f.  Joshua Emanuel Williams, 22; July 3, 2020, multiple sharp-force injuries

g.  Jose Martin Ibarra Garcia, 41; June 15, 2021, multiple stab wounds to the head

h.  Edward Jamar McCloud, 40; July 23, 2021, sharp-force injury to the neck

i.  Jamari McClinton, 21; Aug. 11, 2021, stabbed. He was slain just five days after being transferred from Phillips State Prison, where he had been in protective custody after threats from gang members. Protection was removed when he was transferred.

j.  Bedarius Clark, 26; Aug. 21, 2021, homicide. He was found unresponsive in the prison's segregation unit. The GDC described the death as an assault

k.  Kion E. Parks, 31; Sept. 14, 2021, stabbed. Incident report shows five other inmates were involved in the incident.

l. Rufus Ramon Lee, 27; Dec. 14, 2021, stab wound of the chest. Incident report shows four other inmates were involved in the incident.

m. Kendall Ja'Mal Cromer, 31; Nov. 30, 2020, stab wound of the neck and chest. Incident report shows four other inmates were involved.

n. Hendricks Riley Gunn, 42; Jan. 1, 2022, blunt force injuries of head and neck

o. Douglas Anthony Forts, 57; June 2, 2022, acute traumatic amputation of finger during fight

p. Hezekiah Sha'Nard Cuyler, 21; Sept. 14, 2022, stabbing

q. Dimitri Merci Jackson, 36; Jan. 3, 2023, stab wound of the chest

r. Daniel Charriez, 46; Feb. 23, 2022, delayed complications of traumatic brain injury, four months interval

s. Boyd Henry Williams, 64; Oct. 3, 2022, manual strangulation, blunt force trauma to head

t. Raul Bailon Garcia, 39; April 21, 2020, positional asphyxia and suffocation due to assault, blunt trauma to soft tissues

u. Joctavious Artez Newsome, 25; Nov. 4, 2020, stab wound

v. Demetrius Stubbins, 38; Dec. 21, 2020, stab wound to the chest

w. Christopher Dewayne Mathis, 37; Feb. 26, 2021, blunt force trauma to head

x.  Fabian Garcia-Mata, 27; Sept. 10, 2021, multiple stab wounds

y.  Troy Donald Harvey, 34; Sept. 12, 2021, stab wound of the chest

z.  Cesar Arnold Pastrana Morales, 33; March 13, 2020, stab wound of the chest. Incident report shows five other inmates involved in the incident.

aa. Rashad Bolton, 29; Jan. 4, 2021, puncture wound to the chest with sharp object

bb. Dwayne Zackery Jr., 22; Feb. 12, 2021, stab wound to the chest with homemade knife

cc. Charles Tristen James McKee, 24; May 23, 2022, stabbed. Incident report shows five other inmates directly involved. A lawsuit alleges he was placed in a dorm with known gang members who were hostile to LGBTQ inmates.

dd. Terry Lee Bishop, 49; Oct. 18, 2022, blunt force trauma, acute toxicity of methamphetamine, acute toxicity of cannabinoids

ee. Anthony L. McGhee Jr., 34; March 29, 2020, complications of blunt-force head trauma and sharp-force trauma of torso and extremities

ff. Jorge Renberto Ventura-Cabrera, 35; June 5, 2021, stab wounds of neck, torso and upper extremities. Incident report shows two other inmates involved.

gg. Quintez Smith, 25; Aug. 29, 2022, multiple sharp-force injuries

hh. Jerry Lee Brown, 61; Nov. 12, 2020, stab wounds to the head, blunt-force injury to face

ii. David Lamar Henegar, 44; Oct. 16, 2021, manual strangulation and blunt-force injuries of the head, torso and extremities

jj. Angela Anderson, 39; Sept. 11, 2022, asphyxia due to neck and chest compression

kk. Johnny Eugene Young, 24; Jan. 27, 2020, sharp-force injury of mouth/tongue

ll. Rafael Blas Becerra, 36; March 7, 2020, stab wounds to the upper torso. Incident report shows seven other inmates involved, with six injured.

mm.    Carrington Juwon Frye, 23; March 20, 2020, stab wounds of the neck and chest. Incident report shows two other inmates involved.

nn. David Travis Alexander Dennis, 35; May 13, 2020, multiple sharp-force injuries

oo. Coty Dustin Silvers, 39; May 23, 2020, asphyxia

pp. Bobby Edward Lee Jr., 38; July 13, 2020, ligature strangulation. A federal lawsuit alleges he died from gang violence, understaffing, and indifference by prison officials.

qq. Robbie B. Brower, 58; Oct. 4, 2020, blunt and sharp-force injuries to the head and neck

rr. Raul Villegas, 37; Dec. 13, 2020, stab wound to the torso. Incident report shows three other inmates involved.

ss. Carlos Maurice Fisher Jr., 30; May 10, 2021, multiple sharp-force injuries

tt. Ryan Weston Darville, 37; Dec. 29, 2021, stab wounds of the chest

uu. Joseph Walter Brown, 36; July 26, 2022, multiple stab wounds

vv. Dan Brooks, 50; Aug. 21, 2022, stab wound of the neck

ww.    Kendrick Malik Brown, 25; Oct. 16, 2022, blunt-force head injury

xx. James Cornelius McLeroy III, 26; Dec. 19, 2022, stab wounds of the torso

yy. Norman Samples, 59; Dec. 27, 2022, blunt force injuries of the head and torso

zz. Dave Stone, 61; Nov. 20, 2021, closed head trauma, delayed effects

aaa.    Jamal Cymonne Johnson, 32; June 11, 2022, stab wounds of the head

bbb.    Sidney Sanchez Nealey, 22; July 18, 2022, stab wounds of the torso

ccc.    Jacob Kendall Daniels, 18; Aug. 13, 2022, stab wound of the neck, shoulder and arm

ddd.    Quafabian Melik McBride, 19; Sept. 30, 2022, stab wound of chest, injuring heart; sharp-force injuries of head, torso and upper extremities. Stabbing occurred during a gang-related fight in the lockdown unit. McBride was housed elsewhere in the prison and had been brought to lockdown that day through the arrangements of officers.

eee.    Alim Rasheed Lovett, 33; Dec. 8, 2022, stab wounds of the back, injuring right lung. Also sharp-force injuries of the head, torso and right thigh. Incident report shows four other offenders involved.

fff. Curtis Mincey, 74; July 22, 2021, blunt-force trauma of the head, neck, torso and extremities

ggg.    Taylor Harrison Brooks, 26; April 10, 2020, multiple stab wounds

hhh.    John Bretleir Reyes Cardona, 24; April 20, 2020, exsanguination (severe loss of blood) from stab wound to neck

iii. Justin Nathaniel Wilkerson, 25; Jan. 5, 2021, asphyxia, neck compression

jjj. Desmond Hill, 35; April 9, 2021, strangulation

kkk.    Hiwatha Abdulcah Hakeem Jr., 26; April 12, 2021, multiple stab wounds. Incident report shows four other offenders involved.

lll. Derrick Dionte Deshun Harvey, 26; June 25, 2021, stab wound to the chest

mmm.    Christopher Ray Reynolds, 38; July 1, 2021, blunt- and sharp-force injuries of the head and neck

nnn.    Christopher Michael Redwine, 45; Sept. 27, 2021, asphyxia due to manual strangulation

ooo.    Nathan Michael Mahan, 37; Oct. 23, 2022, stab wounds

ppp.    Randy O'Neal Wynn, 54; March 1, 2023, homicide. Lawsuit alleges supervisory liability claims against Smith State Prison and GDC officials.

qqq.    Cedric La'Troy Johnson Sr., 35; March 13, 2020, strangulation

rrr. Aldrich Norval Cain, 26; April 23, 2020, multiple stab wounds. Incident report shows four other inmates involved.

sss.    Marcus Derrelle Pearson Jr., 28; May 29, 2020, multiple stab wounds. Incident report shows two other inmates involved.

ttt. Luis Garcia Palacio, 41; July 28, 2020, blunt impact injuries of the head

uuu.    Juan Carlos Arguelles-Reveles, 37; May 7, 2021, stabbing. Incident report shows 11 other inmates involved.

vvv.    Xavier LaMar Warren, 32; Dec. 28, 2022, stab wound of the torso. Incident report shows four other inmates involved.

www.    Logan Todd Peterson, 27; Dec. 27, 2021, post-traumatic subarachnoid hemorrhage (bleeding in the space around the brain), assault

xxx.    Prince Leonard Blige, 54; Feb. 12, 2020, stab wound to torso

yyy.    Orvonta Tillman, 36; June 16, 2020, multiple sharp-force penetrating trauma to thorax

zzz.    Bobby Carpenter, 31; Sept. 9, 2020, stab wound to the chest

aaaa.    Hakeem Olajuwon Williams, 27; Feb. 28, 2022, stab wound to the chest

bbbb.    Dexter Jarrod Burnett, 35; Sept. 16, 2022, stab wound of the torso

cccc.    Robert Lee Wilson III, 31; July 17, 2020, multiple stab wounds. Incident report shows 16 other inmates involved, seven of whom were injured.

dddd.    Christopher Arnett Rawls, 32; Sept. 5, 2020, strangulation

eeee.    Christopher Eli Gresham, 39; Sept. 30, 2021, stab wounds of back and lower extremities. A Sept. 30, 2021, incident report of a homicide says three other inmates were involved.

ffff.    Kyle Anthony Strother, 31; June 5, 2022, stab wound of the chest

gggg.     Va'Darian LaVianta Carr, 26; Sept. 18, 2022, stab wound of the chest and back

hhhh.     Marquis Reshawn Jefferson, 26; May 12, 2022, stab wounds of torso and arm. A May 11, 2022, incident report of a homicide says four other inmates were involved.

iiii.     DaQuavious Cachone Lackey, 21; May 16, 2022, stab wound of the neck and multiple blunt-force injuries

jjjj.     Michael Lee Jackson, 60; Aug. 17, 2022, multiple blunt-force injuries in the setting of hypertensive cardiovascular disease. Incident report shows two other inmates were involved.

kkkk.     James Forest Williams, 43; Oct. 3, 2022, blunt and sharp force injuries of head, torso and extremities

llll.     Amos Bennett Huff Jr., 60; March, 2023, strangled

mmmm.   Sabino Carlos Ramos, 34; March, 2023, multiple stab wounds

nnnn.     Arthur James Wimbush Jr., 46; April 2, 2023. Blunt-force trauma with fracture of thyroid cartilage

oooo.     Anthony Zino, 71; April 5, 2023, asphyxia, neck compression inflicted by other

pppp.     LaParrish Dawayne London, 30; March 21, 2023, stab wound of the chest

347.

In 2020, there was a major riot at Ware State prison, in which incarcerated persons obtained facility keys, let scores of other incarcerated persons out of their housing units, held officers hostage and stabbed officers, set fires inside a housing unit office and burned a GDC transport cart, and broke into an office and obtained officers' weapons and defensive gear. The riot resulted in several hospital transports, including four officers, one via helicopter life-flight.

348.

In October 2020, at Georgia State Prison, an incarcerated man was taken to the hospital by ambulance for a cut to his forehead and dark ligature marks around his neck. (Hereinafter referred to as "2020 GA SP Incident")

349.

In the 2020 GA SP Incident, the incarcerated man reported that his bunkmate had tried to kill him by wrapping a sheet around his neck. Less than five months later, an ambulance returned to GSP to pick up the same man. This time, he had yellow and purple bruising on the entire right side of his face, a deformity indicating a possible jaw fracture and multiple human bite marks all over his body.

350.

In the 2020 GA SP Incident the man was so malnourished that every bone in his spine was bruised. He reported that he had been kicked in the face, people had

been stealing his food for months, his bunkmate had been sexually assaulting and raping him, and nobody was helping him

351.

On August 3, 2020, an officer at Phillips State Prison was conducting rounds in a housing unit when an incarcerated person handed him a note stating that an incarcerated person in another cell had been held hostage for days, was yelling for help, and might be injured. In May 2023, DOJ interviewed the victim, who reported that he had been held and tortured for almost four days, he had been stabbed from behind and his eye was pierced and he suffered a traumatic brain injury.

352.

Almost exactly a year later from the incident in the above allegation, on August 12, 2021, the same assailant assaulted another incarcerated person at the same prison; the victim of the second assault required outside medical treatment at a hospital.

353.

At Smith State Prison, in May 2020, GDC staff informed emergency services responders that an incarcerated person had been tied up, beaten, and waterboarded by his cellmate. (hereinafter referred to as "2020 Smith Incident")

354.

In the 2020 Smith Incident, the cellmate also inserted multiple bars of soap into the victim's rectum. One bar of soap, covered in stool and blood, had already fallen out. The victim suffered multiple contusions to his face and chest and was bleeding heavily from his nose and mouth. He had ligature marks on his neck and still had makeshift binding around his wrist. He was transported to a local hospital; while he was being moved to an emergency-room bed, two more bars of soap fell out of his rectum. The hospital found that most of his upper teeth had been broken during the assault. One hundred-fifty milliliters of blood was suctioned from his airway.

355.

On May 22, 2022, at Hancock Prison, an incarcerated person was severely injured while attempting to stop an assault on another inmate

356.

Defendant Oliver's grossly inadequate staffing of prisons, including Smith State Prison, leaves incarcerated persons unsupervised and hampers staff's ability to respond to violence. This occurred in Plaintiff's case and led to Plaintiff's injuries.

357.

Incarcerated people in custody at Georgia prisons, including Plaintiff, were put at substantial risks of serious harm due to severe understaffing in Georgia prisons caused by Defendant Oliver's actions.

358.

In the past several years, staffing in Georgia prisons has been too low to provide reasonable supervision. Vacancies and turnover are high, especially among security staff who are directly responsible for supervising incarcerated persons.

359.

Defendant Oliver has failed to improve the dire staffing problems at Georgia's prisons.

360.

Maintaining adequate staffing levels and ensuring supervision of the population are critical components of a safe and secure prison facility, particularly protection from harm including from violence.

361.

GDC leadership has long presided over a system with severe staffing shortages, with systemwide CO vacancy rates over 50% since mid-2021 – too low to operate reasonably safe and functional facilities.

362.

Beginning in the mid-2010's, a downward trend in staffing numbers already had begun.

363.

From 2014 to 2018, annual average CO vacancy rate at Georgia prisons climbed from almost 11% to over 18%.

364.

Between 2018 and 2023, Georgia prison staffing levels fell precipitously, reaching a systemwide CO vacancy rate of 60% in April 2023, with over 2,800 vacant officer positions. Plaintiff was attacked in this very month as a result of these staffing issues.

365.

Moreover, Georgia's most violent prisons, which includes Smith State Prison, have much higher staff vacancy rates than the systemwide average.

366.

In April 2023, the vacancy rate was over 60% at 20 medium-and close-security prisons; twelve of these prisons had vacancy rates above 70%. Plaintiff was attacked in this very month as a result of these staffing issues.

367.

By the end of 2023, CO vacancy rates remained in the same range at Georgia's most dangerous prisons.

368.

In December 2023, the vacancy rate was over 60% at 18 medium-and close-security prisons; ten of these prisons had vacancy rates above 70%.

369.

The reality of these high vacancy rates is that Georgia was operating most of its close- and medium-security prisons with more officer posts vacant than filled, resulting in inadequate security and supervision.

370.

Between October 2022 and the end of 2023, more than 15 state prisons housing individuals at the medium- and close-security levels saw a net loss in filled CO positions, while several others saw increases only in the single digits.

371.

In interviews with DOJ in 2023, staff at large men's prisons housing incarcerated people at the close-security level reported that high CO vacancy rates over 60%, as well as significant vacancies among supervisory security staff persisted.

372.

GDC's Human Resources Director acknowledged that GDC still "lag[s] behind in the salary market," so pay remains "a factor."

373.

In employee morale surveys conducted at several facilities in 2023, employees cited as the "worst" aspects of their jobs or as the "biggest challenges" facing GDC,

factors including "retaining quality staff," "staff morale," "work environment," and the "safety and security of facilities."

374.

With a systemwide CO vacancy rate over 50%, Defendant Oliver did not staff the most critical posts or conduct other basic correctional operations in GDC prisons, including Smith State Prison.

375.

According to GDC policy, for a prison to maintain normal operations, allotted posts at the Priority 1, 2, and 3 levels must be filled; of these, Priority 1 posts are considered critical.

376.

For example, at the prisons that house incarcerated persons at the medium- and close-security levels, it is generally required that each housing unit be staffed by two or more officers in 24/7 Priority 1 (or otherwise designated as mandatory) posts, with additional Priority 1 posts assigned around the facility, including those stationed at the front entrance and patrolling the perimeter.

377.

According to the GDC, all incarcerated persons classified as close security – over 11,000 incarcerated people, about 23% of GDC's total population – always require supervision by a CO.

378.

Yet GDC leadership and facility staff acknowledged to the DOJ, and the DOJ's review of staffing documents confirms, that, at several prisons, Priority 1 posts are consistently and frequently vacant, leaving officers unable to conduct required rounds and other duties, let alone directly supervise the population.

379.

Facility staffing records document deviations from mandatory staffing requirements, acknowledging that, due to CO staffing shortages, the minimum requirement of CO coverage cannot be met, and that sergeants and unit managers need to assist with basic housing unit coverage.

380.

In practice, however, Georgia prisons do not have enough staff, even including supervisory staff, to cover its Priority 1 posts at many of the prisons the DOJ visited.

381.

Properly conducted well-being checks, referred to as "security rounds" in the prison, are critical to the safety and security of people incarcerated at the prison.

382.

Properly conducted security rounds cannot be effectuated with the dire understaffing problems which occur at Georgia prisons, including Smith State Prison.

383.

During security rounds, officers should verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

384.

With the severe understaffing at Georgia prisons, officers are unable to verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.

385.

Defendant Oliver is aware of chronic short staffing in the prison system but has failed to correct it.

386.

GDC documents and the DOJ's interviews with prison staff illustrate the staffing triage that has become common across the system.

387.

Staff at several Georgia prisons have adopted a practice of assigning one CO to single-handedly supervise two buildings at a time, each comprising two or more housing units and hundreds of incarcerated people, for an entire 12-hour shift.

388.

At a large close-security men's prison known for gang problems and violence, a sampling of staffing rosters from day and night, weekday, and weekend shifts in mid-2023 confirmed that the prison is consistently staffed with well under half the security staff needed to ensure coverage of Priority 1 posts.

389.

On every shift roster the DOJ reviewed at that large close-security men's prison known for gang problems and violence, there was at least one, and sometimes up to four, officers assigned to two buildings at a time; in other words, each of those officers was single-handedly responsible for nearly 400 beds.

390.

The Regional Director responsible for the large close-security men's prison known for gang problems and violence acknowledged that, in practice, the staff assigned to multiple posts are required to switch posts every 30 minutes to check on incarcerated persons in multiple buildings, leaving units and entire buildings unsupervised during those times.

391.

At another large men's prison, a sampling of staffing rosters from 2023 showed that facility leadership consistently assigned officers to cover multiple housing units on the same shift, and that on some shifts supervisory security staff were assigned to cover officer posts in housing units.

392.

A medical employee who worked at the other large men's prison reported there have been times when only two officers were available to cover the entire compound. At times, this employee reported, the perimeter officer would need to vacate the perimeter post to cover security posts inside the facility.

393.

A shift supervisor at a large medium-security men's prison, whom the DOJ interviewed in mid-2023, reported that in a given month, there is unlikely to be a single day on which each building in the prison is covered by at least one officer.

394.

GDC's investigations make clear that staffing shortages place security staff in an untenable position and have contributed to homicides and other serious assaults.

395.

For example, an investigation of a homicide at a GDC men's prison in 2021 found that no staff checks had been done after 9:20 p.m. the night before the death; the body was found the next morning around 9:00 a.m.

396.

In 2022, at a close-security men's prison, an incarcerated man was killed after being assaulted while handcuffed. The investigation found that the officer on duty was single-handedly supervising a control center as well as both sides of the housing unit building where the homicide took place.

397.

Other incidents reveal that when security staff is stretched this thin, incarcerated people are at greater risk of harm.

398.

During DOJ's 17 facility site inspections, the DOJ's experts observed GDC's short staffing in person.

399.

While the DOJ's teams were accompanied by several Special Operations officers brought in to facilitate the DOJ's visits, generally a smaller number of facility-based staff were present.

400.

It was not uncommon on the DOJ's tours for the GDC to temporarily assign dozens of Special Operations staff to the facility, to allow the DOJ's group to tour the facility and to facilitate incarcerated people's movement to participate in interviews with DOJ.

401.

The GDC insisted on setting all of DOJ's site visits several weeks or months in advance to facilitate preparations, and repeatedly informed the DOJ that its group could not split up while on-site, due to the security challenges multiple escorts would pose.

402.

As a result, the GDC did not permit DOJ to tour spontaneously and observe normal operations in the prisons.

403.

However, the DOJ still observed evidence of inadequate staff supervision.

404.

For example, in most of the 17 prisons the DOJ toured, the DOJ's experts repeatedly noted that control centers in housing units appeared to be unmanned and found little evidence that they were consistently occupied (e.g., officers' personal belongings, computer equipment such as a mouse or working monitor).

405.

Similarly, GDC records confirmed that, day-to-day, across the close-and medium-security prisons, staffing shortages were a constant challenge for the officers who are working.

406.

The security staff tasked with running a prison with insufficient backup are forced to cut corners on important prison functions including rounds and wellness checks, as well as proper documentation and recordkeeping.

407.

For example, in a sampling of internal GDC audits from 2023, in 12 out of 13 prison audits, staff failed to properly document required 30-minute cell checks in segregated housing units, with auditors noting that there were lengthy periods of time with no documented checks, or evidence that the checks had been documented before or after the fact, instead of contemporaneously.

408.

As a result of the understaffing caused by Defendant Oliver, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents.

409.

Defendant Oliver is aware of the violence in the prison. Yet he has failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts which continue at dangerous levels. Such led directly to the attack on Plaintiff.

410.

Georgia prisons, due to the supervision, direction, and custom of Defendant Oliver, regularly operates without enough security staff to provide appropriate supervision and prevent violence. These failures led to the attack on Plaintiff.

411.

Inadequate supervision and staffing by Defendant Oliver puts incarcerated people at substantial risk of serious harm from violence and can violate their constitutional rights, especially when other conditions like easy access to weapons contribute to the danger.

412.

Without adequate supervision, incarcerated people are at greater risk of violence and other harm due to unchecked gang activity, assaults, extortion, and access to weapons and drugs.

413.

Not only do Georgia prisons fail to adequately staff its prisons, but they also fail to take reasonable steps to mitigate its staffing shortages.

414.

One way to attempt to mitigate the danger posed by housing units with minimal or infrequent officer presence on the ground is to monitor video in the housing units.

415.

Yet at multiple facilities, security and leadership staff reported to the DOJ that surveillance video in the housing units is not monitored in the housing unit control centers or from central control.

416.

While the warden generally has access to housing-unit surveillance video, the shift supervisor and lower-level security staff do not.

417.

The result of these practices is that nobody is supervising the population in real time.

418.

Defendant Oliver's consistent failure to ensure that even minimum staffing levels are met leads to unsafe prisons.

419.

With housing units left unsupervised for sustained periods of time, incarcerated persons can engage in illicit activities, including exchanging contraband, abusing drugs, making homemade weapons, fetching contraband via drone drops, and engaging in violent assaults. Such occurred in Plaintiff's case.

420.

Gangs and other threat groups tend to step in to fill the void in leadership, telling people where they can or can't sleep and exerting control over prison life.

421.

When security staff are not present to report incidents, perpetrators may not be held accountable and can continue to cause harm to others.

422.

Appropriate follow-up, such as reassigning someone to another housing unit for protection or reclassifying someone who perpetrated an assault, may not occur.

423.

Defendant Oliver's failure to ensure staff presence, supervision, and enforcement of rules and policy in the Georgia prisons contributes to an unsafe environment.

424.

Efforts to enforce prison rules and ensure incarcerated people are where they are supposed to be also falter without adequate staff. Such occurred in Plaintiff's case as he was supposed to be in F1 but was in F2 without staff correcting the issue.

425.

In hundreds of interviews, incarcerated persons reported to DOJ that officers and other staff are in the housing units infrequently and that housing units and entire buildings often are completely unsupervised.

426.

This results in the proliferation of contraband and violence, as well as other rule violations that impede orderly and safe correctional operations.

427.

For example, incarcerated persons and staff consistently reported that it is common for incarcerated persons to sleep in beds other than those to which they are assigned, often because other incarcerated persons who have more power in the housing units tell people where to sleep, and officers do not notice or fail to correct the relocation. This practice illustrates how GDC staff are not in control of the population.

428.

In the event of an emergency, without adequate staffing, the ability to respond in a timely manner is severely hindered. If an assault or other violent or medically urgent incident occurs while staff are not present, the delivery of critical medical treatment to the injured person or persons may be significantly delayed. This is what occurred in Plaintiff's case as Plaintiff remained undiscovered for a period of days after his attack and once discovered, it took a period of days to take Plaintiff to the hospital.

429.

For example, in 2023, an incarcerated man at a large men's prison died after he was badly injured in a fight with another incarcerated person in a housing unit. A

supervisory member of the medical staff recounted that a nurse who responded to the incident was "distraught" after the man died, because, in the immediate aftermath of the assault, medical personnel were not permitted to enter the housing unit due to insufficient security staff to escort them.

430.

As another example, in 2023, Inmate Randy Wynn was killed by his cellmate overnight at Smith State Prison, and he remained undiscovered by staff until the morning. Furthermore, once discovered, it took hours to take his barely alive body to the hospital.

431.

Conditions in Georgia Prisons, which include Smith State prison, obstruct the delivery of medical care. Plaintiff's medical care was constitutionally deficient as Plaintiff did not receive constitutionally adequate medical care for his injuries for several days after he was attacked and did not receive constitutionally adequate medical care for a period of weeks while in solitary confinement.

432.

Security and staffing problems, caused by Defendant Oliver, affect all aspects of healthcare in the prison system.

433.

Many medical care issues stem from Defendant Oliver's failure to provide a reasonably safe facility in which incarcerated people have appropriate access to care.

434.

Constitutionally inadequate medical care already has led to serious injury and death, and it continues to pose a substantial risk of serious harm to people incarcerated in Georgia prisons.

435.

GDC records and EMS reports demonstrate how understaffing causes avoidable delays in providing medical care in emergencies.

436.

For example, GDC records on four deaths of incarcerated persons in 2021 describe bodies that were discovered by staff after the onset of rigor mortis, indicating that hours had likely passed since the individual had died.

437.

In interviews with DOJ, multiple EMS directors identified delays in reaching patients in the prisons, which were apparently due to GDC staffing inadequacies.

438.

The EMS director also said that overnight staffing appears to be a significant issue, noting that there have been instances where it appeared that an emergency had

occurred during the night shift, but prison staff had not requested EMS until the next day.

### 439.

The EMS director also described difficulties in obtaining security escorts for EMS hospital transports due to security staff shortages. Such applies as well to non-emergent medical transports.

### 440.

Numerous incidents from across the system highlight how understaffing has contributed to delays in necessary medical care reaching incarcerated persons who have been harmed in violent incidents.

### 441.

For example, in June 2022, emergency services responded to Coastal State Prison for an unresponsive person. When they arrived, after some delay, they were taken to a cell where an incarcerated man lay dead on the ground. The body had rigor mortis, and was "pale and cool to the touch." GDC staff informed emergency responders that the man was in rigor when they got to him and that they found a syringe near his bed. The cause of death was an overdose

### 442.

On August 20, 2021, emergency services responded to Georgia State Prison for a stab wound. An incarcerated person reported that he was hog tied all night,

stabbed, and then released in the morning after being tied up for over eight hours. Emergency responders noted indentations on the incarcerated person's arms and legs where he was tied. He was airlifted to a hospital.

443.

On December 8, 2020, emergency services responded to Georgia State Prison for an incarcerated person suffering burns to 90% or more of his body. The incarcerated person reported that he was using the phone, laid it down onto the metal flap of his door, and then it caught fire. The fire ignited his clothes and then burned his body. Emergency responders observed burns on his chest, abdomen, back, armpits, left hand, groin, penis, testicles, buttocks, legs, and feet. The man was in extreme pain. Staff reported that the incident was suspected to have happened around 4:00 p.m. to 5:00 p.m., but the incarcerated person was not brought to the medical unit until around 10:24 p.m., just prior to calling emergency services. Transport to the hospital was delayed because prison security staff did not have an officer ready to go. The incarcerated person was eventually airlifted to a hospital.

444.

An incarcerated person was stabbed multiple times on May 23, 2022, at Ware State Prison. There was no security staff in the dorm, so other incarcerated people beat on the window to draw the attention of staff. It took half an hour for someone to respond. The victim was taken to the hospital, where he was diagnosed with a

collapsed lung from a stab wound. After five days in the hospital, he returned to Ware and was locked down in isolation. He was never interviewed about the incident.

445.

Understaffing also can lead to infrequent security and wellness checks and failures to properly document security rounds and other central functions of correctional security staff. Such occurred in Plaintiff's case as he wasn't discovered for hours and even days after the Attack.

446.

GDC's internal facility audits confirm serious failures in security-related documentation and recordkeeping in multiple operational components that directly affect safety.

447.

For example, the audits found evidence that supervisors had cleared counts despite discrepancies, and that count packets, count slips, and other documentation related to counts were inaccurate.

448.

The 2023 facility audits also identified delays in submitting incident reports; inaccuracies and discrepancies in documentation related to contraband control; incomplete documentation and logs for visitor records and facility entry; inconsistent

implementation of required checks and documentation thereof in segregated housing areas; failure to maintain appropriate lists and other records of chemicals, tools, and other materials that could be used for illicit purposes; and inadequate inspection procedures, resulting in irregular performance of required tests.

449.

The audits also indicate that wellness checks are not conducted as required by policy.

450.

For example, 2023 internal compliance audits of operations in segregated housing units in several GDC prisons found evidence of improper documentation of thirty-minute checks in administrative segregation: instead of documenting thirty-minute checks next to each cell door when they occur as required for the safety of individuals in these units, officers likely had back-filled the check logs at the end of a shift.

451.

Adequate security staffing and supervision are essential to a minimally safe and secure prison. Defendant Oliver's failure to ensure adequate staffing in the prisons contributes to harm from violence and to unsafe facilities across the state.

452.

Georgia prisons are unsafe due to aging and inadequately maintained facilities. Defendant Clark through his supervision, failed to maintain Georgia prisons, including Smith State Prison.

453.

Adequate preventive maintenance are essential components of prison security.

454.

Damage to facility hardware and infrastructure poses risks to incarcerated persons' physical safety, as furniture and fixtures can be dismantled to make weapons, holes in ceilings and walls can be used to gain access to unauthorized areas or to hide contraband, and dilapidated and unsanitary conditions can lead to internal tension. Such led to the attack of Plaintiff.

455.

Defendant Clark failed to maintain Georgia prisons, including Smith State Prison, in reasonably safe and secure conditions, placing incarcerated people and others inside and outside the facilities at unacceptable risk.

456.

GDC's internal facility audits, as well as information DOJ obtained from facility site inspections and interviews with staff and incarcerated people, establish that GDC does not take the steps necessary to maintain secure prisons, including timely preventive and corrective maintenance.

457.

Leadership has acknowledged that aging facilities raise challenges across the system, with the average GDC prison over 30 years old and reaching "end of life," according to a recent public presentation by the Commissioner.

458.

Poor maintenance and pervasive contraband, caused by the supervision, direction, custom, and policy of Defendant Clark and Defendant Oliver, contribute to the violence at Georgia prisons, including the violence that Plaintiff was a victim of during the attack.

459.

Defendant Clark and Defendant Oliver are aware of the danger these conditions pose to incarcerated people but have failed to take adequate action to make the facility safe.

460.

Unmaintained parts of Georgia prisons, caused by the supervision, custom, and policy of Defendant Clark and Defendant Oliver jeopardize inmate safety and provided the makeshift weapons for the attacks onto Plaintiff.

461.

Due to poor maintenance by Defendant Clark, Georgia prisons are a source of dangerous weapons and expose people to violence.

462.

Frequently, Georgia prisons, through the leadership of Defendant Clark, fail to promptly fix things that break in its facilities – even when the thing that is broken is as central to prison operations as a lock or key.

463.

A 2023 GDC facility audit found that staff failed to submit maintenance requests for broken keys.

464.

Staff at the same prison explained in an interview with DOJ that the officer designated to perform lock-and-key duties is frequently pulled from that assignment to cover security posts, and therefore is unable to maintain the lock-and key system at the prison.

465.

Staff from Georgia prisons said that getting broken locks fixed is a perennial challenge due to issues including short staffing, not having a locksmith on staff at the prison, or challenges obtaining parts to fix old locks.

466.

Additionally, Georgia prisons, as a result of the understaffing by Defendant Oliver, does not have sufficient security and maintenance staff to maintain facilities

after fixing broken fixtures, windows, walls, ceilings, and other components of facilities.

467.

The DOJ was told repeatedly by incarcerated people, including those who work maintenance details and are responsible for facility repairs, and some staff that an enormous amount of repair work was undertaken prior to DOJ's site visits to each prison. Despite these efforts, during site visits, the DOJ's experts observed physical building and maintenance issues that affect security, including broken or exposed electrical outlets and wiring, metal fixtures, large holes or patched areas in ceilings and walls, and small holes and cracks in walls and windows.

468.

Georgia prisons, under the leadership of Defendant Clark, also fail to comply with their own policies to regularly evaluate, test, and document the condition of its security infrastructure and systems.

469.

Internal audits confirm that Georgia prisons fail to take necessary steps to ensure its prisons are secure.

470.

For example, several 2023 facility audits found that Georgia prisons fail to perform required checks of windows and doors to ensure they have not been cut or modified.

471.

Several facility audits also found that Georgia prisons fail to maintain accurate key and tool inventories and to document key counts and checks.

472.

For example, one 2023 facility audit of a close-security men's prison noted inconsistencies in accounting for and inventorying tools, and a lack of consistent control and documentation regarding chemical agents, weapons, and inventory.

473.

Defendant Clark's failure to maintain control of such sensitive equipment as keys and tools exposes the population (and staff) to an unreasonable risk of harm, because discrepancies and failures to follow policies in these areas can compromise the physical security of the facilities' doors and gates and can facilitate the use of weapons and other contraband.

474.

Georgia prisons fail to control weapons, drugs, and other dangerous contraband in its prisons.

475.

Georgia prison contraband controls fail to address the scope and complexity of the problem of contraband in the prisons, particularly weapons, illicit drugs, and unauthorized electronics (e.g., cellphones).

476.

Inadequate staffing and supervision, caused by Defendant Oliver, combined with ready access to contraband sources, allow incarcerated people to easily purchase, manufacture, possess, openly display, and use weapons, cellphones, and drugs.

477.

As a result, the volume of contraband in the prisons remains high, and the existence of weapons cellphones, and drugs, and the marketplace surrounding these items, places incarcerated persons at risk.

478.

Between November 2021 and August 2023, Georgia prisons recovered 27,425 weapons, 12,483 cellphones, and 2,016 illegal drug items; during the same time period, GDC documented 262 drone sightings and 346 fence-line throw overs.

479.

GDC officials acknowledged that the agency's problems with contraband are extensive in scope and that the prevalence of contraband places the population at risk.

480.

Contraband can be smuggled into prisons in various ways; staff have been caught bringing contraband in through standard entry points, throw packages of contraband over exterior fences or using remote-controlled aerial devices to perform "drone drops".

481.

Contraband weapons can be smuggled in, or, given the opportunity, incarcerated persons can make "shanks" – homemade knives – and other weapons by dismantling and sharpening metal objects and other materials found inside the prisons.

482.

Serious deficiencies in day-to-day prison operations contribute to the ongoing prevalence of contraband.

483.

At the most basic level, prison staff are not conducting routine, day-today searches of individuals and areas.

484.

Searches should include routine and surprise searches of housing units, random pat-downs of incarcerated persons moving between areas, and careful inspections for physical security breaches.

485.

Searches also should be sufficiently thorough to identify and remove contraband from searched areas.

486.

GDC's own policies require such safeguards, but in practice facility staff do not comply with the policies with the consistency required to address the problem.

487.

However, without adequate staffing, searches cannot occur as needed in Georgia prisons.

488.

In 2023, GDC internal audits of several prisons found inadequate or incomplete facility-wide searches, failures in reporting procedures for incidents involving contraband, incomplete documentation of searches, irregular handling of discovered contraband, and inconsistency in inspecting packages for contraband.

489.

GDC policy requires regular full prison searches; the audits indicate that such searches and inspections are not conducted as frequently as required by policy, and are not taking place regularly or according to appropriate procedures.

490.

After a major incident, or as part of a special operation, GDC may call in a tactical team to conduct a search, but afterwards, staff go back to their regular practices. The lack of routine attention to security searches is a serious flaw. The types of searches the State publicizes are too infrequent and belated for a problem of such scope.

491.

GDC's staffing, supervision, and management deficiencies caused by Defendant Oliver, contribute to the failure to adequately control contraband.

492.

Georgia prisons does not have the number of staff needed to implement a system of regular searches and security checks.

493.

With large portions of the population unsupervised for long periods of time, incarcerated people have opportunities to make weapons, abuse drugs, and engage in a black market for contraband.

494.

Additionally, the DOJ review of staffing rosters and interviews with prison staff showed that officers working perimeter posts are sometimes assigned to other Priority 1 posts on the same shift, or fully re-assigned to interior duties for periods

of time or entire shifts, leaving the perimeter more vulnerable to contraband introduction.

495.

The severe staffing shortages also contribute to staff vulnerability to criminal schemes involving incarcerated persons and STGs; Georgia prisons routinely places staff in stressful, challenging environments without sufficient support from other officers and supervisors.

496.

For years, the State has wrestled with staff corruption related to contraband.

497.

Hundreds of employees have been arrested, including the warden of Smith State Prison in 2023, for crimes related to contraband.

498.

The DOJ also identified problems with employee background-check and screening processes in GDC employee personnel files.

499.

For example, concerns about criminal histories, financial problems, and possibly gang-affiliated associates were identified in the background-check process, but the individual had been hired without any documentation in their file of

mitigating circumstances or why their hiring was appropriate despite the identified concerns.

500.

Because housing units in prisons across the system often are completely unsupervised, violent incidents and other incidents, such as property destruction and illicit drug use, occur without any staff observation.

501.

Defendant Oliver and Defendant Clark have been aware, for a long time, of the violence in Georgia's prisons, and of the operational and management problems that contribute to the high levels of violence, including chronic understaffing, and easily accessible contraband.

502.

Defendant Oliver and Defendant Clark have been aware, for a long time, that Georgia prisons had staffing issues and a growing incarcerated population that, if not properly addressed, would lead to a crisis.

503.

Adequate staffing is critical to providing essential supervision and security in prisons.

504.

As early as 1985, the GDC Commissioner represented that there were not enough COs and that salaries were too low.

505.

In 1999, officials at the GDC again noted the mounting issue: "While the number of GDC employees remains steady, the total number of offenders continues to rise."

506.

By 2006, GDC's annual report acknowledged staffing had continued to decline: Staffing numbers are lower today than they were in 1999, even though the population has increased by around 12,300 people, or 31%.

507.

In 2019, officials at the GDC emphasized that, "Retention of Correctional Officers (COs) continues to be a challenge" and "[b]etween FY 2017 and FY 2019, CO turnover increased from 27.2% to 42.1%."

508.

While there have been some fluctuations over the years, for several years officials at the GDC have failed to hire and retain enough staff to keep the population safe.

509.

Several recent lawsuits against officials at Georgia prisons have alleged constitutional violations, including failure to protect incarcerated people from harm.

510.

Reportedly, the GDC has spent almost $20 million since 2018 to settle claims involving death or injury to people incarcerated in its prisons.

511.

In 2023, the GDC settled a lawsuit brought by an incarcerated man's family, after he was strangled to death by his cellmate at Macon State Prison in 2020, a consequence, the family alleged, of GDC's deliberate indifference.

512.

In a state-court lawsuit against GDC, GDC's former medical contractor alleged in its pleadings that GDC's failure to control violence in the prisons led to extraordinarily high medical costs for trauma care.

513.

Defendant Oliver and Defendant Clark are aware of the facts in the above allegations.

514.

Moreover, Defendant Oliver and Defendant Clark are aware, through GDC data, that violence and threats of violence are widespread in the prisons.

515.

GDC leadership officials, such as Defendant Oliver and Defendant Clark are sent a selected portion of the data that facilities collect in incident reports and other documentation.

516.

For each facility, a monthly report containing statistics, including those related to violent incidents, is generated for review by the warden and regional manager. Defendant Oliver and Defendant Clark read over these reports.

517.

Defendant Oliver and Defendant Clark receive reports of emergencies and serious incidents across the system.

518.

For example, from 2022 through April 2023, these reports available to GDC leadership, such as Defendant Oliver and Defendant Clark included 1,045 incidents of violence, including assaults, fights, and homicides.

519.

Georgia prisons also produce comprehensive reports of statistics monthly, including the number of assaults, deaths, and uses of force. Defendant Oliver and Defendant Clark read these reports.

520.

Defendant Oliver and Defendant Clark are likewise aware of factors that increase the risk of violence in GDC facilities,

521.

Defendant Oliver and Defendant Clark likewise have been on notice of systemic deficiencies that contribute to harm in its prisons.

522.

Year after year, the prisons continue to collect enormous amounts of contraband, including weapons, drugs, and electronics, from within prisons across the system. Defendant Oliver and Defendant Clark are aware of this.

523.

GDC officials also have acknowledged its facilities are in dire need of repair.

524.

The State of Georgia has closed some facilities and undertaken renovations in others.

525.

For example, in early 2022, GDC closed Georgia State Prison, a notoriously violent and dilapidated prison.

526.

In 2023, GDC announced plans to close or repurpose Lee Arrendale State Prison, and began to implement plans to open a larger, renovated women's prison in McRae, Georgia, to which most of the Lee Arrendale population would be moved.

527.

The State also recently allocated funds for a new state prison in Washington County, to replace the current Washington State Prison, as well as some increased funding for facility maintenance and repairs statewide.

528.

The GDC also temporarily closed Autry State Prison for renovations, and has undertaken renovation projects, including lock "hardening" and other improvements, at other prisons.

529.

Through their own data and public attention, Defendant Oliver and Defendant Clark have been aware that systemic deficiencies within the Georgia prison system increase the risk of harm to the people in its custody.

530.

Defendant Oliver's and Defendant Clark's efforts have been inadequate, as evidenced by the ongoing harm and significant risk of serious harm in the prisons.

531.

It is plainly evident, from not only the staffing levels and crime in the prisons but also by the prevalence of harm, that Georgia prisons expose the people it incarcerates to a substantial risk of serious harm, and that Defendant Oliver's and Defendant Clark's, policies and practices have failed to address the pervasive problems.

532.

Defendant Oliver and Defendant Clark have known of the substantial risk of serious harm presented by widespread violence in Georgia prisons, but rather than address the violence, they have failed to take reasonable steps to address those unconstitutional conditions.

533.

The constitutional deprivations caused by Defendant Oliver and Defendant Clark led directly to the attack, injury, deficient medical care, and pain and suffering of Plaintiff.

**COUNT I**
**Section 1983 Claims under Eighth Amendment: Cruel and Unusual Punishment; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Protect; Failure to Take Reasonable Measures to Guarantee Safety**
**(Against Defendant White, Individually)**

534.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

**Page 135 of 234**

535.

There was a substantial risk of serious harm to Plaintiff as there was an excessive risk of inmate-on-inmate violence at Smith State Prison where violence and terror reign. Inmate-on-inmate violence was the norm or something close to it as evidenced by the numerous stabbings and homicides at Smith State Prison.

536.

There was a substantial risk of serious harm to Plaintiff leading up to the attack, as he was housed in an environment with a widespread makeshift knife problem, was placed in a dorm with violent gang members, was in a dorm where inmates were roaming freely and popping locks, was in a dorm where, upon information and belief, four other inmates were previously killed, and went missing from his dorm to the knowledge of the Prison officials.

537.

Defendant White actually knew of the risks of serious harm because the prison was on lockdown due to a murder that had recently happened, she was aware of the four inmate deaths that occurred in that dorm, she was aware of the risks that the inmates posed to each other, and she was aware that if Plaintiff was missing, he was likely in danger.

538.

Defendant White, individually, was deliberately indifferent to the substantial risks of serious harm posed to Plaintiff leading up to and during the attack, failed to keep Plaintiff reasonably safe by failing to make any effort to locate Plaintiff and failing to report Plaintiff's believed disappearance while knowing that Plaintiff was likely in danger.

539.

Defendant White knowingly failed to take reasonable steps to protect Plaintiff from violence at the hands of other inmates who posed a substantial risk of serious harm to Plaintiff leading up to the attack because, among other things, Defendant White failed to make any effort to locate Plaintiff and failed to report Plaintiff's believed disappearance while knowing that Plaintiff was likely in danger.

540.

Leading up to the attack, Defendant White possessed subjective knowledge that by failing to make any effort to locate Plaintiff and failing to report Plaintiff's believed disappearance while knowing that Plaintiff was likely in danger she was placing Plaintiff at a substantial risk of serious harm.

541.

Defendant White had subjective knowledge of the risks of serious harm to Plaintiff leading up to the attack, as evidenced by the following non-exhaustive list of facts:

a. There were at least 4 people who died in Plaintiff's dorm before Plaintiff was placed in it.

b. There were many violent gang members in the dorm where Plaintiff was placed.

c. Plaintiff was housed in an environment with a widespread makeshift knife problem

d. Upon information and belief, on the day of the attack, the entire prison was supposed to be on lockdown, but the prisoners were popping locks and roaming about the prison.

e. At the time of Plaintiff's attack, there was no officer in the tower over Plaintiff's dorm.

f. Before the attack, Plaintiff was on the phone with his wife who was going to visit him. Plaintiff's wife came into the prison twice to see Plaintiff, but Plaintiff's wife was told by Counselor White that Plaintiff refused visitation each time. When Defendant White came to the dorm that Plaintiff was supposed to be in and did not find him, she simply

turned back and told Plaintiff's wife that he refused visitation. She never looked for him or checked up on him.

542.

Defendant White disregarded the substantial risk of serious harm to Plaintiff leading up to the attack, as evidenced by the following non-exhaustive list of facts:

a. There were at least 4 people who died in Plaintiff's dorm before Plaintiff was placed in it.

b. There were many violent gang members in the dorm where Plaintiff was placed.

c. Plaintiff was housed in an environment with a widespread makeshift knife problem

d. Upon information and belief, on the day of the attack, the entire prison was supposed to be on lockdown, but the prisoners were popping locks and roaming about the prison.

e. At the time of Plaintiff's attack, there was no officer in the tower over Plaintiff's dorm.

f. Before the attack, Plaintiff was on the phone with his wife who was going to visit him. Plaintiff's wife came into the prison twice to see Plaintiff, but Plaintiff's wife was told by Counselor White that Plaintiff refused visitation each time. When Defendant White came to the dorm

that Plaintiff was supposed to be in and did not find him, she simply turned back and told Plaintiff's wife that he refused visitation. She never looked for him or checked up on him.

543.

Plaintiff was attacked, stabbed, and tortured by multiple inmates as a result of Defendant White's deliberate indifference described herein.

544.

As indicated above, Defendant White's conduct was more than mere negligence.

545.

There is an affirmative causal connection between Defendant White's conduct and the constitutional deprivations described herein. Defendant White's failure to protect as described herein caused Plaintiff's injuries and pain and suffering, and Plaintiff's injuries and attack were a foreseeable consequence of Defendant White's failure to protect.

546.

Defendant White's failures to take reasonable action to protect Plaintiff from known risks of serious harm amounted to deliberate indifference and a failure to

protect in violation of the Eighth Amendment and proximately caused Plaintiff physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, lost capacity to earn, and other general and special damages.

547.

Defendant White is not entitled to qualified immunity because her conduct violated the basic legal principle that "A prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware,* exists and the official does not respond reasonably to the risk.". *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014).

548.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT II**
**Section 1983 Claims under Eighth Amendment:**
**Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment**
**(Against Defendant Jones, Individually)**

549.

Plaintiff hereby incorporates by reference the allegations set forth in

Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

550.

Plaintiff suffered from an objectively serious medical need after the attack,

as he suffered from 8 stab wounds of the upper back, head trauma, acute bilateral

nose fractures, large acute post-traumatic left orbital medial wall blowout fracture

with approximate 1.15 cm extension into the medial fractured left ethmoid air

cells, acute approximate 4.5 mm depressed left orbital floor fracture, slightly acute

post-traumatic depressed left nasal bone fracture, age indeterminate non-depressed

right nasal bone fracture, large left frontal hemosinus and diffuse hemosinus

throughout the non-compressed left ethmoid air cells, small hemosinus within the

left maxillary sinus, moderate sized remote appearing right orbital medial wall

blowout fracture, small acute avulsion fracture deformity of the anterior nasal

spine, mild left lateral anterior bony nasal septal deviation, generalized diffuse soft

tissue swelling about the left orbital, left nasal and left premaxillary soft tissue

region, small acute avulsion fracture deformity of the anterior nasal sinus,

ossification of the anterior longitudinal ligament noted at C4-5, C5-6, and C6-7,

mild anterior spondylosis noted at C5-6 and C6-7, right eye with subconjunctival

hemorrhage, anisocoria with left eye larger than right eye, and superficial

laceration to left cheek, among other things.

551.

Defendant Jones was deliberately indifferent to Plaintiff's serious medical needs from the attack and Defendant Jones's response to Plaintiff's injuries was objectively insufficient, as indicated by the following list of non-exhaustive facts:

a. After the attack, Plaintiff was unconscious and suffering from life-threatening injuries for a couple of days. Defendant Jones was aware of this.

b. Despite the brutal and widely publicized nature of the attack, it took around a week for the prison to take Plaintiff to a hospital.

c. In the investigative report made by Defendant Jones, the attack is not classified as an incident where an inmate incurred "serious injury".

d. In the investigative report made by Defendant Jones, the timing of the attack is listed as April 2, 2023 at 6:20 AM.

e. However, in the DOJ report, Plaintiff's attack is listed as happening on April 1, 2023.

f. The investigative report by Defendant Jones was entered on April 6, 2023, indicating either that Defendant Jones discovered Plaintiff on April 6, 2023 or waited until April 6, 2023 to fill out the report.

g. Defendant Jones knew of the severity of the attack and would have seen the video of the attack as Plaintiff's family notified the GDC and

other officials of the attack on Plaintiff multiple times before Plaintiff

was taken to the hospital, on either April 7, 2023, or April 8, 2023,

11Alive reached out to the Georgia Department of Corrections about

the video and attack on Plaintiff and received the following statement:

"We are currently investigating the incident and the offenders

involved.", and the video of Plaintiff's attack went viral on social

media and received traditional news coverage before Plaintiff was

taken to the hospital.

h. In spite of all the notice and warning of Plaintiff's attack and injuries,

Plaintiff was not taken to the hospital until April 10, 2023, which was

at least 8 or 9 days after Plaintiff was brutally beaten.

i. In spite of all the notice and warning of Plaintiff's attack and injuries,

Plaintiff was not taken to the hospital until April 10, 2023 which was

at least 4 days after Defendant Jones discovered Plaintiff and his

condition.

j. Defendant Jones had the means and the authority to have Plaintiff

taken to the hospital.

552.

Upon finding Plaintiff either on April 2, 2023 or April 6 2023, Defendant

Jones had subjective awareness of the facts signaling the need for medical attention

as Plaintiff suffered from bleeding open wounds and suffered from obvious signs of severe head trauma.

553.

Required action by Defendant Jones upon finding Plaintiff either on April 2, 2023 or April 6 2023 would be to radio prison transport to take Plaintiff to the hospital or call for an ambulance to take Plaintiff to the hospital. However, Plaintiff was not taken to the hospital until March 10, 2023, which is at least 4 days after Plaintiff was discovered.

554.

Defendant Jones's refusal and failure to provide medical attention or call for medical attention for Plaintiff upon discovering Plaintiff caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

555.

Defendant Jones is not entitled to qualified immunity for his conduct upon discovering Plaintiff because he had more than fair warning that his conduct was unconstitutional in waiting at least four days to have Plaintiff taken to the hospital or to call for an ambulance after Plaintiff presented with bleeding open wounds and with obvious signs of severe head trauma, as indicated in *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985) and more.

Page **145** of **234**

556.

Defendant Jones is not entitled to qualified immunity for his conduct as his deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

557.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT III
### Section 1983 Claims under Eighth Amendment:
### Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Personal Participation Supervisory Liability Over Deliberate Indifference to Serious Medical Needs
### (Against Defendant Jones, Individually)

558.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

**Page 146 of 234**

559.

Defendant Jones is liable to Plaintiff for his failures to adequately supervise prison staff regarding the provision of medical treatment after the attack.

560.

Defendant Jones was subjectively aware of the actions and omissions of his subordinates when Plaintiff was found bleeding and suffering from obvious signs of head trauma. This is supported by the fact that Defendant Jones was directly involved in finding Plaintiff and Defendant Jones was the reporting official when Plaintiff was found.

561.

Defendant Jones ratified the actions and omissions of his subordinates when Plaintiff was found by delaying the calling of an ambulance or the taking of Plaintiff to a hospital for at least four days even though Plaintiff had recently been brutally beaten, was unconscious for a period of days, was suffering from open wounds, and displayed obvious signs of a traumatic head injury.

562.

Defendant Jones refused to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury,

disfigurement, pain and suffering, constitutional deprivations, medical bills, lost

earning capacity, and other harms and damages.

563.

Defendant Jones's refusal to take action to supervise his staff to reasonably

respond to Plaintiff's serious medical needs caused Plaintiff's constitutional

deprivations and caused Plaintiff to suffer prolonged pain and suffering associated

with his injuries as well as delayed recovery.

564.

Defendant Jones's personal participation as described herein caused Plaintiff

to not be taken to the hospital for over four days even though Plaintiff suffered

from life threatening injuries.

565.

Defendant Jones is not entitled to qualified immunity for his conduct in

failing to supervise prison staff when Plaintiff was found brutally beaten and

bleeding.

566.

As a result of the wrongful conduct described above, Plaintiff suffered from

permanent injuries, disfiguring injuries, physical and mental pain and suffering,

extreme mental and emotional distress, humiliation, shock, and fright, medical bills,

violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT IV
### Section 1983 Claims under Eighth Amendment:
### Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment
### (Against Defendant Beasley, Individually)

567.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

568.

Plaintiff suffered from an objectively serious medical need after the attack, as he suffered from 8 stab wounds of the upper back, head trauma, acute bilateral nose fractures, large acute post-traumatic left orbital medial wall blowout fracture with approximate 1.15 cm extension into the medial fractured left ethmoid air cells, acute approximate 4.5 mm depressed left orbital floor fracture, slightly acute post-traumatic depressed left nasal bone fracture, age indeterminate non-depressed right nasal bone fracture, large left frontal hemosinus and diffuse hemosinus throughout the non-compressed left ethmoid air cells, small hemosinus within the left maxillary sinus, moderate sized remote appearing right orbital medial wall

blowout fracture, small acute avulsion fracture deformity of the anterior nasal

spine, mild left lateral anterior bony nasal septal deviation, generalized diffuse soft

tissue swelling about the left orbital, left nasal and left premaxillary soft tissue

region, small acute avulsion fracture deformity of the anterior nasal sinus,

ossification of the anterior longitudinal ligament noted at C4-5, C5-6, and C6-7,

mild anterior spondylosis noted at C5-6 and C6-7, right eye with subconjunctival

hemorrhage, anisocoria with left eye larger than right eye, and superficial

laceration to left cheek, among other things.

569.

Defendant Beasley was deliberately indifferent to Plaintiff's serious medical

needs from the attack and Defendant Beasley's response to Plaintiff's injuries was

objectively insufficient, as indicated by the following list of non-exhaustive facts:

    a.   After the attack, Plaintiff was unconscious and suffering from life-
threatening injuries for a couple of days. Defendant Beasley was
aware of this.

    b.   Despite the brutal and widely publicized nature of the attack, it took
around a week for the prison to take Plaintiff to a hospital.

    c.   In the investigative report reviewed by Defendant Beasley, the attack
is not classified as an incident where an inmate incurred "serious
injury".

d. In the investigative report reviewed by Defendant Beasley, the timing of the attack is listed as April 2, 2023 at 6:20 AM.

e. However, in the DOJ report, Plaintiff's attack is listed as happening on April 1, 2023.

f. Defendant Beasley knew of the severity of the attack and would have seen the video of the attack as Plaintiff's family notified the GDC and other officials of the attack on Plaintiff multiple times before Plaintiff was taken to the hospital, on either April 7, 2023, or April 8, 2023, 11Alive reached out to the Georgia Department of Corrections about the video and attack on Plaintiff and received the following statement: "We are currently investigating the incident and the offenders involved.", and the video of Plaintiff's attack went viral on social media and received traditional news coverage before Plaintiff was taken to the hospital.

g. In spite of all the notice and warning of Plaintiff's attack and injuries, Plaintiff was not taken to the hospital until April 10, 2023, which was at least 8 or 9 days after plaintiff was brutally beaten.

h. In spite of all the notice and warning of Plaintiff's attack and injuries, Plaintiff was not taken to the hospital until April 10, 2023 which was at least 4 days after Defendant Beasley knew of Plaintiff's condition.

**Page 151 of 234**

i. Defendant Beasley had the means and the authority to have Plaintiff taken to the hospital.

570.

Upon learning of Plaintiff's condition via the news, the family, or social media as well as upon learning of Plaintiff's condition on February 6, 2023 through the incident report, Defendant Beasley had subjective awareness of the facts signaling the need for medical attention as Plaintiff's beating was brutal, Plaintiff suffered from bleeding open wounds, and Plaintiff suffered from obvious signs of severe head trauma.

571.

Required action by Defendant Beasley upon learning of Plaintiff's condition via the news, the family, or social media as well as upon learning of Plaintiff's condition on February 6, 2023 through the incident report would be to have Plaintiff taken to a hospital. However, Plaintiff was not taken to the hospital until March 10, 2023, which is at least 4 days after Plaintiff was discovered.

572.

Defendant Beasley's refusal and failure to have Plaintiff properly cared for caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

573.

Defendant Beasley is not entitled to qualified immunity for his conduct upon discovering Plaintiff because he had more than fair warning that his conduct was unconstitutional in waiting at least four days to have Plaintiff taken to the hospital or to call for an ambulance after Plaintiff presented with bleeding open wounds and with obvious signs of severe head trauma, as indicated by *Aldridge v. Montgomery*, 753 F.2d 970 (11th Cir. 1985) and more.

574.

Defendant Beasley is not entitled to qualified immunity for his conduct as his deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

575.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical

bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT V
### Section 1983 Claims under Eighth Amendment:
### Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Personal Participation Supervisory Liability Over Deliberate Indifference to Serious Medical Needs
### (Against Defendant Beasley, Individually)

576.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

577.

Defendant Beasley is liable to Plaintiff for his failures to adequately supervise Defendant Jones and other prison staff regarding the provision of medical treatment after the attack.

578.

Defendant Beasley was subjectively aware of the actions and omissions of his subordinates, including Defendant Jones, when Plaintiff was found bleeding and suffering from obvious signs of head trauma. This is supported by the fact that

Defendant Beasley reviewed the incident report on the same day that Plaintiff was found.

579.

Defendant Beasley ratified the actions and omissions of his subordinates, including Defendant Jones, when Plaintiff was found, by delaying the calling of an ambulance or the taking of Plaintiff to a hospital for at least four days even though Plaintiff had recently been brutally beaten, was unconscious for a period of days, was suffering from open wounds, and displayed obvious signs of a traumatic head injury.

580.

Defendant Beasley refused to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury, disfigurement, pain and suffering, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

581.

Defendant Beasley's refusal to take action to supervise his staff to reasonably respond to Plaintiff's serious medical needs caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

Page **155** of **234**

582.

Defendant Beasley's personal participation as described herein caused Plaintiff to not be taken to the hospital for over four days even though Plaintiff suffered from life threatening injuries

583.

Defendant Beasley is not entitled to qualified immunity for his conduct in failing to supervise prison staff, including Defendant Jones, when Plaintiff was found brutally beaten and bleeding.

584.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT VI**
**Section 1983 Claims under Eighth Amendment:**
**Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment**
**(Against Defendant Wilson, Individually)**

585.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

586.

Plaintiff suffered from objectively serious medical needs while in solitary confinement as he suffered from stab wounds, eye wounds, and facial fractures which were in critical stages of healing.

587.

Defendant Wilson was deliberately indifferent to Plaintiff's serious medical needs while in solitary confinement and Defendant Wilson's response to Plaintiff's pleas for bandage and eye wound changes were objectively insufficient, as indicated by the following list of non-exhaustive facts:

a. During Plaintiff's time in solitary confinement, Defendant Wilson made it hard for Plaintiff to get medical care.

b. While Plaintiff's eye and stab wounds were supposed to be changed every day, he had to beg Defendant Wilson during the week to get Plaintiff medical help to no avail.

c. During Plaintiff's time in solitary confinement, Plaintiff asked Defendant Wilson plenty of times if he could get his bandage checked on or changed. In response to these requests, Defendant Wilson denied Plaintiff's eye and bandage medical care plenty of times,

saying things like "if they don't come and get you then I ain't going to do nothing extra". This denial of medical care occurred for a period of weeks following Plaintiff's injuries.

d.  On multiple occasions after the attack and while in solitary confinement, Plaintiff asked Defendant Wilson for medical help and for his bandages to be changed, but Plaintiff was denied medical care and told things like "there's nothing wrong with you".

588.

After Plaintiff's multiple requests for bandage changes and after seeing Plaintiff's wounds, Defendant Wilson had subjective awareness of the facts signaling the need for medical attention as Plaintiff's wounds were in critical stages of healing and if not cared for properly, would cause Plaintiff prolonged pain and suffering as well as permanent damage.

589.

Required action by Defendant Wilson upon learning of Plaintiff's needs for wound changes would be to notify medical staff of Plaintiff's medical needs or even set up a time to take Plaintiff to the medical wing. However, Defendant Wilson instead was deliberately indifferent to Plaintiff's pain and well-being and did not want to take Plaintiff to the medical wing because it constituted extra work in his opinion.

590.

Defendant Wilson's refusal and failure to provide medical attention or call for medical attention for Plaintiff after Plaintiff's numerous pleas for help caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

591.

Defendant Wilson is not entitled to qualified immunity for his conduct as his deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

592.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

### COUNT VII
### <u>Section 1983 Claims under Eighth Amendment:</u>

**Deliberate Indifference to Serious Medical Needs; Failure to Take Reasonable
Measures to Guarantee Safety; Cruel and Unusual Punishment
(Against Defendant Whitfield, Individually)**

593.

Plaintiff hereby incorporates by reference the allegations set forth in
Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

594.

Plaintiff suffered from objectively serious medical needs while in solitary
confinement as he suffered from stab wounds, eye wounds, and facial fractures
which were in critical stages of healing.

595.

Defendant Whitfield was deliberately indifferent to Plaintiff's serious
medical needs while in solitary confinement and Defendant Whitfield's response to
Plaintiff's pleas for bandage and eye wound changes were objectively insufficient,
as indicated by the following list of non-exhaustive facts:

   a. During Plaintiff's time in solitary confinement, Plaintiff would also
      ask Defendant Whitfield for bandage changes but Defendant
      Whitfield denied those requests.

   b. During Plaintiff's time in solitary confinement, when Defendant
      Whitfield denied Plaintiff's requests for help, he did so as a result of a

"you did this to yourself attitude" and would say things like "I ain't doing nothing to you. I ain't put you in there. I ain't hurt you."

596.

After Plaintiff's multiple requests for bandage changes and after seeing Plaintiff's wounds, Defendant Whitfield had subjective awareness of the facts signaling the need for medical attention as Plaintiff's wounds were in critical stages of healing and if not cared for properly, would cause Plaintiff prolonged pain and suffering as well as permanent damage.

597.

Required action by Defendant Whitfield upon learning of Plaintiff's needs for wound changes would be to notify medical staff of Plaintiff's medical needs or even set up a time to take Plaintiff to the medical wing. However, Defendant Whitfield instead was deliberately indifferent to Plaintiff's pain and well-being and did not want to take Plaintiff to the medical wing because he believe that Plaintiff put himself in the position of needing a bandage change and thereby deserved it.

598.

Defendant Whitfield's refusal and failure to provide medical attention or call for medical attention for Plaintiff after Plaintiff's numerous pleas for help caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

599.

Defendant Whitfield is not entitled to qualified immunity for his conduct as his deliberate indifference to serious medical needs violated the basic legal principle that "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255.

600.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT VIII**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Personal Participation Supervisory Liability Over**
**Deliberate Indifference to Serious Medical Needs**
**(Against Defendant Whitfield, Individually)**

601.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

Page 162 of 234

602.

Defendant Whitfield is liable to Plaintiff for his failures to adequately supervise prison staff, including Defendant Wilson, regarding the provision of medical treatment to Plaintiff while in solitary confinement.

603.

Defendant Whitfield was subjectively aware of the actions and omissions of Defendant Wilson. This is supported by the fact that Defendant Whitfield worked closely with Defendant Wilson and also denied Plaintiff bandage changes.

604.

Defendant Whitfield ratified the actions and omissions of Defendant Wilson while Plaintiff was in solitary confinement, by allowing Defendant Wilson to outright refuse Plaintiff's bandage changes as well as outright refusing Plaintiff's bandage changes himself.

605.

Defendant Whitfield refused to take action to supervise his staff and Defendant Wilson, to reasonably respond to Plaintiff's serious medical needs, which resulted in Plaintiff's injury, pain and suffering, constitutional deprivations, medical bills, and other harms and damages.

606.

Defendant Whitfield's refusal to take action to supervise his staff and Defendant Wilson, to reasonably respond to Plaintiff's serious medical needs caused Plaintiff's constitutional deprivations and caused Plaintiff to suffer prolonged pain and suffering associated with his injuries as well as delayed recovery.

607.

Defendant Whitfield's personal participation as described herein caused Plaintiff's bandages to not get changed and this caused Plaintiff prolonged pain and suffering as well as a delayed recovery.

608.

Defendant Whitfield is not entitled to qualified immunity for his conduct in failing to supervise Defendant Wilson and other staff when they refused medical care to Plaintiff while Plaintiff was in solitary confinement.

609.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT IX**
**Section 1983 Claims under Eighth Amendment: Excessive Force under Eighth Amendment; Cruel and Unusual Punishment**
**(Against Defendant Wilson, Individually, and Defendant Whitfield, Individually)**

610.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

611.

Defendant Wilson, while under color of law, intentionally committed acts that violated Plaintiff's constitutional right to be free from the use of excessive force.

612.

Defendant Whitfield, while under color of law, intentionally committed acts that violated Plaintiff's constitutional right to be free from the use of excessive force.

613.

Defendant Wilson used excessive force against Plaintiff when he sprayed mace or pepper spray in Plaintiff's cell and closed the flap so that Plaintiff would be forced to breathe in the fumes.

614.

Defendant Whitfield used excessive force against Plaintiff when he sprayed mace or pepper spray in Plaintiff's cell and closed the flap so that Plaintiff would be forced to breathe in the fumes.

615.

In all such incidences, Defendant Wilson's excessive use of force was purposefully and knowingly used against Plaintiff.

616.

In all such incidences, Defendant Whitfield's excessive use of force was purposefully and knowingly used against Plaintiff.

617.

In all such incidences, Defendant Wilson's use of excessive force was applied maliciously or sadistically to cause harm.

618.

In all such incidences, Defendant Whitfield's use of excessive force was applied maliciously or sadistically to cause harm.

619.

In all such incidences, Defendant Wilson's and Defendant Whitfield's excessive use of force against Plaintiff was applied maliciously or sadistically to cause harm, as indicated by the following non-exhaustive list of facts:

a. There was no rational basis or real need to use force against Plaintiff because he did not present a threat to any officer or inmate as he was behind bars in his cell and the pepper spray was used for no penological purpose;

b. The amount of force used was extreme as Plaintiff was forced to breathe in the fumes of the mace or pepper spray;

c. Plaintiff suffered from physical harm as a result of the use of force;

d. Defendant Wilson and Defendant Whitfield did not make any efforts to temper or limit the amount of force used

e. Plaintiff posed no security problem or threat to any officer or inmate before the use of excessive force as he was in a cell in solitary confinement

f. Plaintiff was not suspected of any crime or disciplinary violation before the use of excessive force

620.

Defendant Wilson's use of force was not rationally related to a legitimate government objective as it accomplished nothing but to harass and torture Plaintiff.

621.

Defendant Whitfield's use of force was not rationally related to a legitimate government objective as it accomplished nothing but to harass and torture Plaintiff.

622.

A more than a de minimis injury resulted from the use of force, as Plaintiff suffered from physical injuries from the use of excessive force, among other things.

623.

Defendant Wilson is not entitled to qualified immunity for his conduct as his use of excessive force violated the basic legal principle that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth Amendment. In this case, the necessity for the application of force never arose, and therefore the application of force was a violation of the Eighth Amendment. *Ort v. White*, 813 F.2d 318, 327 (11th Cir. 1987). See also for reference, *Shuford v. Conway*, 666 F. App'x 811, 817 (11th Cir. 2016).

624.

Defendant Whitfield is not entitled to qualified immunity for his conduct as his use of excessive force violated the basic legal principle that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth Amendment. In this case, the necessity for the application of force never arose, and therefore the application of force was a violation of the Eighth Amendment. *Ort v. White*, 813 F.2d 318, 327 (11th Cir. 1987). See also for reference, *Shuford v. Conway*, 666 F. App'x 811, 817 (11th Cir. 2016).

625.

Defendant Wilson is not entitled to qualified immunity for his conduct as his use of excessive force violated the principle that "[p]rison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation." *Ort v. White*, 813 F.2d 318, 325 (11th Cir. 1987). See also for reference, *Shuford v. Conway*, 666 F. App'x 811, 817 (11th Cir. 2016).

626.

Defendant Whitfield is not entitled to qualified immunity for his conduct as his use of excessive force violated the principle that "[p]rison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation." *Ort v. White*, 813 F.2d 318, 325 (11th Cir. 1987). See also for reference, *Shuford v. Conway*, 666 F. App'x 811, 817 (11th Cir. 2016).

627.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

## COUNT X
## Section 1983 Claims under Eighth Amendments:
## Violation of Substantive Due Process; Cruel and Unusual Punishment
## Failure to Intervene
## (Against Defendant Wilson, Individually, and Defendant Whitfield, Individually)

628.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

629.

Defendant Whitfield, under color of law, failed or refused to intervene when Defendant Wilson used unconstitutional excessive force in his presence when Defendant Wilson sprayed mace or pepper spray in Plaintiff's cell and closed the flap so Plaintiff would be forced to breathe in the fumes.

630.

Defendant Wilson used excessive force on Plaintiff when he sprayed mace or pepper spray in Plaintiff's cell and closed the flap so Plaintiff would be forced to breathe in the fumes, even though Plaintiff posed no security threat to anyone.

631.

Defendant Whitfield saw Defendant Wilson use excessive force onto Plaintiff and knew that Defendant Wilson was going to use excessive force onto Plaintiff as this force was used over the course of multiple months while Plaintiff

was in solitary confinement. In fact, Defendant Whitfield himself participated in the use of excessive force.

632.

Defendant Whitfield had a realistic opportunity to prevent the harm from occurring as he was close enough to restrain Defendant Wilson and had the opportunity to verbally talk Defendant Wilson out of using the excessive force.

633.

Defendant Whitfield also had a realistic opportunity to prevent the harm from occurring as this force was used over the course of multiple months while Plaintiff was in solitary confinement

634.

Defendant Whitfield failed to take reasonable steps to prevent the harm from occurring as he took no steps at all and even participated in the use of excessive force.

635.

Defendant Whitfield is not entitled to qualified immunity because he had more than fair warning that his conduct was unconstitutional.

636.

Defendant Wilson, under color of law, failed or refused to intervene when Defendant Whitfield used unconstitutional excessive force in his presence when

Defendant Whitfield sprayed mace or pepper spray in Plaintiff's cell and closed the flap so Plaintiff would be forced to breathe in the fumes.

637.

Defendant Whitfield used excessive force on Plaintiff when he sprayed mace or pepper spray in Plaintiff's cell and closed the flap so Plaintiff would be forced to breathe in the fumes, even though Plaintiff posed no security threat to anyone.

638.

Defendant Wilson saw Defendant Whitfield use excessive force onto Plaintiff and knew that Defendant Whitfield was going to use excessive force onto Plaintiff as this force was used over the course of multiple months while Plaintiff was in solitary confinement. In fact, Defendant Wilson himself participated in the use of excessive force.

639.

Defendant Wilson had a realistic opportunity to prevent the harm from occurring as he was close enough to restrain Defendant Whitfield and had the opportunity to verbally talk Defendant Whitfield out of using the excessive force.

640.

Defendant Wilson also had a realistic opportunity to prevent the harm from occurring as this force was used over the course of multiple months while Plaintiff was in solitary confinement

641.

Defendant Wilson failed to take reasonable steps to prevent the harm from occurring as he took no steps at all and even participated in the use of excessive force.

642.

Defendant Wilson is not entitled to qualified immunity because he had more than fair warning that his conduct was unconstitutional.

643.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages

**COUNT XI**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Personal Participation Supervisory Liability Over**
**Excessive Force**
**(Against Defendant Whitfield)**

644.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

645.

Page **173** of **234**

Defendant Whitfield is liable to Plaintiff for his failures to adequately supervise Defendant Wilson regarding the use of excessive force onto Plaintiff while Plaintiff was in solitary confinement.

646.

Defendant Whitfield was subjectively aware of the actions of Defendant Wilson, when Defendant Wilson sprayed mace or pepper spray into Plaintiff's cell and closed the flap so that Plaintiff was forced to breathe in the fumes. This is supported by the fact that Defendant Whitfield was directly involved in such conduct, witnessed such conduct, and such conduct occurred over a period of months while Plaintiff was in solitary confinement.

647.

Defendant Whitfield ratified the actions and omissions of Defendant Wilson by participating in and condoning the senseless pepper spraying of Plaintiff while Plaintiff was in his cell.

648.

Defendant Whitfield refused to take action to supervise Defendant Wilson, to prevent the use of excessive force against Plaintiff, and to reprimand Defendant Wilson for his actions and this resulted in Plaintiff's injury, physical and mental

pain and suffering, constitutional deprivations, medical bills, and other harms and damages.

649.

Defendant Whitfield is not entitled to qualified immunity for his conduct in failing to supervise Defendant Wilson.

650.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages

**COUNT XII**
**Section 1983 Claims under First and Eighth Amendment**
**Retaliation for Writing Grievances And Having A Claim Against Prison**
**Officials; Cruel and Unusual Punishment and Cruel and Unusual Solitary**
**Confinement**
**(Against Defendant Snowden, Individually, Defendant Beasley, Individually,**
**Defendant McFarlane, Individually, Defendant Whitfield, Individually, and**
**Defendant Wilson, Individually)**

651.

Plaintiff hereby incorporates by reference the allegations set forth in

Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

**Page 175 of 234**

652.

Plaintiff attempted to use the legal system and communicated his attempt to use the legal system to Defendant Snowden by writing grievances, speaking about the claims made in this Complaint, seeking to speak with his lawyers, and attempting to take part in rehabilitative activities.

653.

Plaintiff attempted to use the legal system and communicated his attempt to use the legal system to Defendant Beasley and Defendant McFarlane by writing grievances, speaking about the claims made in this Complaint, seeking to speak with his lawyers, and attempting to take part in rehabilitative activities.

654.

Plaintiff attempted to use the legal system and communicated his attempt to use the legal system to Defendant Whitfield and Defendant Wilson by writing grievances, speaking about the claims made in this Complaint, seeking to speak with his lawyers, and attempting to take part in rehabilitative activities.

655.

Plaintiff's attempts to use the legal system and communications to Defendant Snowden, Defendant Beasley, Defendant McFarlane, Defendant Whitfield, and Defendant Wilson of his intent to use the legal system were made in

good faith as an exercise of Plaintiff's First Amendment rights and were not bad-faith threats intended as acts of harassment.

656.

Defendant Snowden intentionally retaliated against Plaintiff and punished Plaintiff because of his attempt to use the legal system and his communications of his intent to use the legal system to Defendant Snowden by placing Plaintiff in Solitary Confinement after the Attack, placing plaintiff on food restrictions, isolating Plaintiff from his family and from his lawyers, restricting Plaintiff's communication with other counselors at the Prison, and hindering Plaintiff's attempts to pursue rehabilitation through the Prison's processes and policies.

657.

Defendant Beasley and Defendant McFarlane intentionally retaliated against Plaintiff and punished Plaintiff because of his attempt to use the legal system and his communications of his intent to use the legal system to Defendant McFarlane and Defendant Beasley by placing Plaintiff in Solitary Confinement after the Attack, placing plaintiff on food restrictions, isolating Plaintiff from his family and from his lawyers, restricting Plaintiff's communication with other counselors at the Prison, and hindering Plaintiff's attempts to pursue rehabilitation through the Prison's processes and policies.

658.

Defendant Wilson intentionally retaliated against Plaintiff and punished Plaintiff because of his attempt to use the legal system and his communications of his intent to use the legal system to Defendant Wilson by giving Plaintiff insufficient amounts of food, putting feces on Plaintiff's food tray, isolating Plaintiff from his family and from his lawyers, not taking Plaintiff to the medical wing, bullying Plaintiff and exposing his personal information to the entire dorm, and pepper spraying Plaintiff while in the cell.

659.

Defendant Whitfield intentionally retaliated against Plaintiff and punished Plaintiff because of his attempt to use the legal system and his communications of his intent to use the legal system to Defendant Whitfield by denying Plaintiff's requests for bandage changes and additional clothing, denying Plaintiff's requests to buy more food, giving Plaintiff insufficient food, isolating Plaintiff from his family and from his lawyers, and pepper spraying Plaintiff while in the cell.

660.

Defendant Snowden, Defendant Beasley, Defendant McFarlane, Defendant Whitfield, and Defendant Wilson acted under color of law when they retaliated against and punished Plaintiff.

661.

Such conduct constituted retaliation in violation of the First Amendment as well as cruel and unusual punishment in violation of the Eighth Amendment.

662.

Further, Defendant Beasley's, Defendant McFarlane's, and Defendant Snowden's placement of Plaintiff in solitary confinement for a period of 10-11 months, where Plaintiff's living conditions were unsanitary, Plaintiff received insufficient food, and Plaintiff was mistreated constituted cruel and unusual punishment in violation of the Eighth Amendment.

663.

Defendant Snowden is not entitled to qualified immunity for his conduct as described herein.

664.

Defendant Beasley and Defendant McFarlane are not entitled to qualified immunity for their conduct as described herein.

665.

Defendant Whitfield is not entitled to qualified immunity for his conduct as described herein.

666.

Defendant Wilson is not entitled to qualified immunity for his conduct as described herein.

667.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT XIII**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Supervisory Claims**
**(Against Defendant Adams, Individually, Defendant Beasley, Individually,**
**and Defendant McFarlane, Individually)**

668.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-245 of the instant Complaint as if fully set forth herein verbatim.

669.

Defendant Adams was the Warden at Smith State Prison up until February 8, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

670.

Defendant Adams's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

671.

Defendant Beasley was the Warden at Smith State Prison after March 1, 2023, and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

672.

Defendant Beasley's unconstitutional management of Smith State Prison, in part caused the constitutional violations and injuries described herein.

673.

Defendant McFarlane was the Deputy Warden of Security at Smith State Prison at all relevant times to this Complaint and was responsible for overseeing the daily operations, managing staff, and ensuring the safety and security of both inmates and staff, among other things.

674.

Defendant McFarlane was the Deputy Warden of Security at all times relevant to this Complaint and was responsible for overseeing security staff members and managing specific groups of inmates, ensuring security, maintaining a safe environment, and overseeing security protocols within the prison system.

675.

Defendant Adams is sued for his policy making, failures to investigate incidents of violence and the free flow of contraband, failures to prevent the free-flow of contraband by inmates and guards, supervisory conduct in the operation

and management of Smith State Prison as well as for the harms created by his illegal smuggling activity which had not been corrected, and in part caused Plaintiff's attack and injuries.

676.

Defendant Beasley is sued for his policy making, failures to maintain security policies, failures to supervise prison staff, failures to investigate incidents of violence as well as failing to keep the prison safe, secure, and properly staffed in order to prevent inmate-on-inmate violence and the free flow of contraband, failures to prevent the free-flow of contraband by inmates and guards, failures to ensure safe and efficient delivery of medical care, failures to ensure rounds were being conducted properly and effectively, and supervisory conduct in the operation and management of Smith State Prison.

677.

Defendant McFarlane is sued for his policy making, training, failures to maintain security policies, failures to supervise prison staff, failures to investigate incidents of violence as well as failing to keep the prison safe, secure, and properly staffed in order to prevent inmate-on-inmate violence and the free flow of contraband, failures to prevent the free-flow of contraband by inmates and guards, failures to ensure rounds were being conducted properly and effectively, and supervisory conduct in the operation and management of Smith State Prison.

678.

Plaintiff had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment prevented Defendant Adams, Defendant Beasley, and Defendant McFarlane, as well as those under their supervision, from exercising deliberate indifference toward Plaintiff's safety, security, and constitutional rights.

679.

Plaintiff's constitutional rights were violated by Defendant Adams's subordinates, which were correctional officers on duty who were responsible for investigating contraband and incidents of violence and maintaining the facilities, as he was subjected to the unconstitutional conditions described in this complaint and the attacks which injured and maimed him with man-made shanks.

680.

Plaintiff's constitutional rights were violated by Defendant Beasley's subordinates, which include Defendant McFarlane, Defendant White, Defendant Jones, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities, as he was subjected to the unconstitutional conditions described in this

complaint, the attacks which injured and maimed him, and the constitutionally deficient medical care he received afterwards.

681.

Plaintiff's constitutional rights were violated by Defendant McFarlane's subordinates, which include Defendant White, Defendant Jones, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities, as he was subjected to the unconstitutional conditions described in this complaint, the attacks which injured and maimed him, and the constitutionally deficient medical care he received afterwards.

682.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of the facility, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, severe understaffing, insufficient security rounds, and compromised correctional officers, among other things, that put Defendant Adams on notice of the need to take action and he failed to do so.

683.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of the facility, insufficient medical care, deficient classification systems, inadequate systems for preventing and investigating violence, poor supervision of staff, severe understaffing, insufficient security rounds, and compromised correctional officers, among other things, that put Defendant Beasley on notice of the need to take action and he failed to do so.

684.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of the facility, insufficient medical care, insufficient classification systems, inadequate systems for preventing and investigating violence, poor supervision of staff, severe understaffing, insufficient security rounds, and compromised correctional officers, among other things, that put Defendant McFarlane on notice of the need to take action and he failed to do so.

685.

Defendant Adams is liable to Plaintiff for his failures to adequately supervise prison staff regarding the free flow of contraband and smuggling which

provided the weapons used to harm and injure Plaintiff, deficient investigations into incidents of violence and the failure to maintain the prison facilities.

686.

Defendant Beasley is liable to Plaintiff for his failures to adequately supervise prison staff, including Defendant McFarlane, Defendant White, Defendant Jones, and other correctional officers on duty, regarding the prevention of the attacks onto Plaintiff, the discovery of Plaintiff while and after he was attacked, conducting rounds, dilapidation of facilities, the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff, and the constitutionally deficient medical care Plaintiff received afterwards.

687.

Defendant McFarlane is liable to Plaintiff for his failures to adequately supervise prison staff, including Defendant White, Defendant Jones, and other correctional officers on duty, regarding the prevention of the attacks onto Plaintiff, the discovery of Plaintiff while and after he was attacked, conducting rounds, dilapidation of facilities, and the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff.

688.

Defendant Adams was subjectively aware of the actions and omissions of the prison staff who allowed the free flow of contraband and smuggling which provided the weapons used to harm and injure Plaintiff and the deficient investigations into incidents of violence and the failure to maintain the prison facilities. This is supported by the fact that Defendant Adams had seen and signed off on the incidents of violence and findings of contraband. This is also supported by the fact that Defendant Adams was charged with racketeering activity associated with a smuggling ring operating inside the prison.

689.

Defendant Beasley was subjectively aware of the actions and omissions of Defendant McFarlane, Defendant White, Defendant Jones, and other correctional officers on duty as well as the systematic violence and free flow of contraband at Smith State Prison. This is supported by the fact that Defendant Beasley had seen and signed off on the incidents of violence, incidents of deficient medical care, and findings of contraband.

690.

Defendant McFarlane was subjectively aware of the actions and omissions of Defendant White, Defendant Jones, and other correctional officers on duty as well as the systematic violence and free flow of contraband at Smith State Prison.

This is supported by the fact that it would have been obvious to Defendant McFarlane that these problems persisted as he oversaw the daily operations at Smith State Prison.

691.

Defendant Adams ratified the actions and omissions of his subordinates by participating in a smuggling ring at the prison, failing to enforce and enact security practices such as the performance of security rounds, failing to control the free-flow of contraband, and understaffing the prison, among other things.

692.

Defendant Beasley ratified the actions and omissions of his subordinates by failing to enforce and enact security practices such as the performance of security rounds, failing to control the free-flow of contraband, and failing to respond to and investigate incidents and complaints of violence, among other things.

693.

Defendant McFarlane ratified the actions and omissions of hos subordinates by failing to enforce and enact security practices such as the performance of security rounds, failing to control the free-flow of contraband, and failing to respond to and investigate incidents and complaints of violence, among other things.

694.

Defendant Adams, Defendant Beasley, and Defendant McFarlane refused to take action to supervise their staff, to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, to restrict the free flow of contraband, and to adequately staff the facility, which resulted in Plaintiff's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

695.

Defendant Adams, Defendant Beasley, and Defendant McFarlane fostered an unreasonable environment of violence which motivated and encouraged inmates to commit violence against each other and which resulted in Plaintiff's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, lost earning capacity, and other harms and damages.

696.

Defendant Adams's, Defendant Beasley's, and Defendant McFarlane's personal participation as described herein caused Plaintiff to be attacked, injured, and maimed.

697.

Violence and terror reign at Smith State Prison to such an extent that the

attack and torture of Plaintiff is actionable under clearly established federal law.

698.

The U.S. Constitution imposes duties on prison officials, who must take

reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511

U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

699.

The U.S. Supreme Court has made clear that prison officials have a duty to

protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*,

511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

700.

It is well established that "confinement in a prison where violence and terror

reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)

(*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320

(11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

701.

Defendant Adams, Defendant Beasley, and Defendant McFarlane are not

entitled to qualified immunity for their conduct in failing to supervise their staff,

failing to investigate and prevent incidents and complaints of violence, failing to

actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, failing to restrict the free flow of contraband, failing to ensure proper security practices and adequate security rounds, failing to adequately staff the facility, and failing to take action despite a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

702.

The unconstitutional policies and practices related to the handling of inmates at Smith State Prison, failures to create adequate local security policies, inadequate security practices relating to performing rounds and investigating acts of violence, failures to adopt adequate local prison policies on maintaining prison structures and facilities, inadequate practices on investigating incidents of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate staffing practices, inadequate practices on medical care in emergency situations, and others which were created and effectuated by Defendant Adams, Defendant Beasley, and Defendant McFarlane are described in thorough detail in

allegations 148-245 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.[2]

703.

Such policies and practices resulted in Defendant McFarlane, Defendant White, Defendant Jones, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities acting with deliberate indifference to Plaintiff's constitutional rights

704.

Defendant Adams, Defendant Beasley, and Defendant McFarlane carried out and put such policies into place, and such unconstitutional policies were persistent and wide-spread. Factual support for this contention is detailed thoroughly in allegations 148-245.

705.

Defendant Adams had authority and responsibility over the governing of the Smith State Prison and its operations and had the authority and responsibility of

---

[2] The Eleventh Circuit has described four main types or categories of shotgun pleadings. The first type is a complaint containing "multiple counts where each count adopts the allegations of all preceding **counts**, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015) (emphasis added). Here, however, Plaintiff has not incorporated the entire complaint—nor has Plaintiff incorporated prior counts—into each count of the Complaint; instead, Plaintiff has incorporated only specifically enumerated facts that are specifically relevant to that count.

implementing some policies and procedures for the Prison. Defendant Adams also implemented practices which were followed by his subordinates.

706.

Defendant Beasley had authority and responsibility over the governing of the Smith State Prison and its operations and has the authority and responsibility of implementing some policies and procedures for the Prison. Defendant Beasley also implemented practices which were followed by his subordinates.

707.

Defendant McFarlane had the authority and responsibility for carrying out the policies and procedures of the Smith State Prison and was responsible for supervising and making policies and practices for the day-to-day operations of Smith State Prison.

708.

Defendant Adams had supervisory responsibility as well as some final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the Smith State Prison local policies, procedures, and practices related to inmate-on-inmate violence, contraband prevention and removal, maintenance of the facility, and investigations into violence, among other things.

709.

Defendant Beasley had supervisory responsibility as well as some final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the Smith State Prison local policies, procedures, and practices related to inmate-on-inmate violence, contraband prevention and removal, maintenance of the facility, investigations into violence, the conducting of rounds, and the provision of medical care, among other things.

710.

Defendant McFarlane had supervisory responsibility for the unconstitutional conditions from which Plaintiff suffered related to inmate-on-inmate violence, contraband prevention and removal, maintenance of the facility, investigations into violence, and the conducting of rounds, among other things.

711.

Defendant Adams implemented and carried out Smith State Prison local policies, procedures, and practices that constituted deliberate indifference to Plaintiff's substantial risks of serious harm. Such policies, procedures, and practices are described in great detail in allegations 148-245 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

712.

Defendant Adams's supervision at Smith State Prison constituted deliberate indifference to Plaintiff's substantial risks of serious harm. Such supervision is described in great detail in allegations 148-245 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

713.

Defendant Beasley implemented and carried out Smith State Prison local policies, procedures, and practices that constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. Such policies, procedures, and practices are described in great detail in allegations 148-245 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

714.

Defendant Beasley's supervision at Smith State Prison constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. Such supervision is described in great detail in allegations 148-245 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

715.

Defendant McFarlane's supervision and practices at Smith State Prison constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. Such supervision is described in great detail in allegations 148-245 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

716.

Defendant Adams, Defendant Beasley, and Defendant McFarlane disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 148-245.

717.

Defendant Adams's, Defendant Beasley's, and Defendant McFarlane's unconstitutional policies, procedures, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and injured by the makeshift weapons, was attacked because staff did not respond appropriately to incidents of prior violence, suffered from delayed medical care as a result of short staffing and a failure to conduct sufficient security rounds, and suffered from delayed medical care, among other things.

718.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of

Defendant Adams, Defendant Beasley, and Defendant McFarlane related to the handling of inmates at Smith State Prison, failures to supervise prison staff, inadequate practices on maintaining facility structures and facilities, inadequate security practices relating to performing rounds and investigating acts of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate practices in providing medical care in emergency situations and others are laid out in great detail in allegations 148-245.  In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

719.

Such customs, practices, and supervision created and carried out by Defendant Adams, Defendant Beasley, and Defendant McFarlane constituted a persistent and wide-spread practice. Facts supporting this contention are thoroughly discussed in allegations 148-245.

720.

Such customs, practices, and supervision created and carried out by Defendant Adams, Defendant Beasley, and Defendant McFarlane constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm. Such customs, practices, and supervision are described in great detail in allegations 148-245 and are incorporated herein. In those

allegations, the wrongful acts of each defendant are attributable, and the customs, practices, and supervision are thoroughly explained.

721.

Defendant Adams, Defendant Beasley, and Defendant McFarlane disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 148-245.

722.

Such customs, practices, and supervision resulted in Defendant McFarlane, Defendant White, Defendant Jones, and other correctional officers on duty who were responsible for conducting rounds, investigating contraband and incidents of violence, and maintaining the facilities acting with deliberate indifference to Plaintiff's constitutional rights

723.

Defendant Adams's, Defendant Beasley's, and Defendant McFarlane's unconstitutional customs, practices, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and injured by the makeshift weapons, was attacked because staff did not respond appropriately to incidents of prior violence, suffered from delayed medical care as a result of short staffing and a failure to conduct sufficient security rounds, and suffered from delayed medical care, among other things.

724.

Defendant Adams's Defendant Beasley's, and Defendant McFarlane's above failures amount to deliberate indifference to the safety of inmates in violation of the Eighth Amendment.

725.

Defendant Adams Defendant Beasley, and Defendant McFarlane had actual and constructive knowledge of widespread, persistent patterns of inmate-on-inmate violence as well as of the other constitutional violations described herein.

726.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

727.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

728.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)

(*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

729.

Defendant Adams, Defendant Beasley, and Defendant McFarlane are not entitled to qualified immunity for their conduct in failing to supervise their staff, failing to investigate and prevent incidents and complaints of violence, failing to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners, failing to restrict the free flow of contraband, failing to ensure proper security practices and adequate security rounds, failing to adequately staff the facility, and failing to take action despite a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration, as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and others.

730.

Wherefore, Plaintiff is entitled to recover under Section 1983 against Defendant Adams, Defendant Beasley, and Defendant McFarlane.

731.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical

bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**COUNT XIV**
**Section 1983 Claims under Eighth Amendment:**
**Failure to Take Reasonable Measures to Guarantee Safety; Cruel and**
**Unusual Punishment; Supervisory Liability**
**(Against Defendant Oliver in his individual capacity and Defendant Clark in**
**his individual capacity)**

732.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-533 of the instant Complaint as if fully set forth herein verbatim.

733.

Defendant Oliver was the Commissioner of the Georgia Department of Corrections and was responsible for managing a $1.3 billion budget, leading approximately 9,000 employees, and the supervision of nearly 50,000 state offenders. This includes staffing decisions and policies.

734.

At all relevant times, Defendant Clark was the Director of Engineering & Construction Services for the Georgia Department of Corrections and was responsible for management and oversight of the ECS division, which is

responsible for the design, construction, and maintenance of the Georgia prison's physical infrastructure.

735.

Defendant Oliver is sued for his policy making, customs, staffing and supervisory conduct in the operation and management of Georgia prisons, which include Smith State Prison.

736.

Defendant Clark is sued for his policy making, customs, and supervisory conduct related to maintenance and repair practices at Georgia prisons, which include Smith State Prison.

737.

Plaintiff had a right to be protected from cruel and unusual punishment under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment prevented the Defendants from exercising deliberate indifference toward Plaintiff's safety, security, and constitutional rights.

738.

Plaintiff's constitutional rights were violated by Defendant Oliver's and Defendant Clark's subordinates as he was subjected to the attack which injured and maimed him, suffered as a result of understaffing and failures to conduct security rounds, was stabbed with a makeshift weapon, and suffered as a result of constitutionally deficient medical care when he was not seen for medical care for his life-threatening injuries for days.

739.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, failures to conduct security rounds, severe understaffing, and compromised correctional officers, among other things, that put Defendant Oliver on notice of the need to take action and he failed to do so.

740.

There was a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, the unconstitutional living conditions, poor supervision of staff, and severe understaffing, among other

things, that put Defendant Clark on notice of the need to take action and he failed to do so.

741.

Violence and terror reign at Georgia prisons, including Smith State Prison to such an extent that the attack onto Plaintiff is actionable under clearly established federal law.

742.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

743.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

744.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)

(citing *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

745.

Defendant Oliver is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, insufficient medical care, inadequate systems for preventing and investigating violence, poor supervision of staff, failures to conduct security rounds, severe understaffing, and compromised correctional officers as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

746.

Defendant Clark is not entitled to qualified immunity for his failure to take action in the face of a history of widespread abuse that was obvious, flagrant, rampant, and of continued duration with regards to inmate-on-inmate violence, the free flow of contraband, the dilapidation of prison facilities, the unconstitutional living conditions, poor supervision of staff, and severe understaffing as indicated

by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), and *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) and others.

747.

The unconstitutional policies related to the handling of inmates at Georgia prisons, including Smith State Prison, inadequate policies on investigating incidents of violence, inadequate practices to prevent inmate-on-inmate violence and the free flow of contraband, inadequate staffing policies and practices, inadequate staffing for medical care, and others which were created and effectuated by Defendant Oliver are described in thorough detail in allegations 246-533 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

748.

The unconstitutional policies related to the handling of inmates at Georgia prisons, including Smith State Prison, practices leading to unclean, unsafe, and unconstitutional living conditions, failures to adopt adequate policies on maintaining prison structures and facilities, inadequate practices regarding the maintenance of prison structures and facilities, inadequate practices to prevent the creation of contraband, and others which were created and effectuated by Defendant Clark are described in thorough detail in allegations 246-533 and are

incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

749.

Such policies resulted in Defendant Oliver's and Defendant Clark's subordinates acting with deliberate indifference to Plaintiff's constitutional rights.

750.

Defendant Oliver and Defendant Clark carried out and put such policies into place, and such unconstitutional policies were persistent and wide-spread. Factual support for this contention is detailed thoroughly in allegations 246-533.

751.

Defendant Oliver had authority and responsibility over staffing Georgia prisons and had the authority and responsibility of implementing policies and procedures for the Georgia prisons.

752.

Defendant Clark had the authority and responsibility for carrying out the policies and procedures related to maintenance of Georgia prisons and was responsible for supervising and making policies and practices for the maintenance of Georgia prisons.

753.

Defendant Oliver had the final policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the policies and procedures related to inmate-on-inmate violence, contraband prevention and removal, facility staffing, budget allocation decisions, and the provision of medical care, among other things.

754.

Defendant Clark had supervisory responsibility as well as policy making authority for the unconstitutional conditions from which Plaintiff suffered as well as for the maintenance and repair of Georgia prisons, which includes Smith State Prison.

755.

Defendant Oliver and Defendant Clark implemented and carried out policies and procedures that constituted deliberate indifference to Plaintiff's substantial risks of serious harm as well as serious medical needs. They also exposed Plaintiff to unreasonable risks of harm. Such policies and procedures are described in great detail in allegations 246-533 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the policies are thoroughly explained.

756.

Defendant Oliver and Defendant Clark disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 246-533.

757.

Defendant Oliver's and Defendant Clark's unconstitutional policies, procedures, practices, and supervision caused and were a moving force behind Plaintiff's constitutional deprivations and injuries, as Plaintiff was attacked, maimed, and stabbed by the makeshift weapons, suffered as a result of short staffing and a failure to conduct sufficient security rounds, and suffered as a result of delayed medical treatment, among other things.

758.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Oliver related to the handling of inmates at Georgia Prisons, including Smith State Prison, the institution of unclean, unsafe, and unconstitutional living conditions, severe understaffing leading to failures to conduct security rounds and discover medical emergencies, severe understaffing, failures to prevent inmate-on-inmate violence and the free flow of contraband, failures to provide adequate

**Page 209 of 234**

medical services, and others are laid out in great detail in allegations 246-533. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

759.

Unconstitutional customs, supervision, practices and courses of conduct that are so widespread that they have acquired the force of law, through repeated acts of Defendant Clark related to the handling of inmates at Georgia Prisons, including Smith State Prison, the institution of unclean, unsafe, and unconstitutional living conditions, failures to maintain prison structures and facilities to prevent the creation of makeshift weapons, and others are laid out in great detail in allegations 246-533. In those allegations, the wrongful acts of each defendant are attributable and the policies are thoroughly explained.

760.

Such customs, practices, courses of conduct, and supervision created and carried out by Defendant Oliver and Defendant Clark constitute a persistent and wide-spread practice. Facts supporting this contention are thoroughly discussed in allegations 246-533.

761.

Such customs, practices, courses of conduct and supervision created and carried out by Defendant Oliver and Defendant Clark constituted a deliberate indifference to the safety, security, and rights of Plaintiff and exposed Plaintiff to unreasonable risks of harm. Such customs, practices, and supervision are described in great detail in allegations 246-533 and are incorporated herein. In those allegations, the wrongful acts of each defendant are attributable, and the customs, practices, and supervision are thoroughly explained.

762.

Such customs, practices, courses of conduct and supervision resulted in Defendant Oliver's and Defendant Clark's subordinates acting with deliberate indifference to Plaintiff's constitutional rights.

763.

Defendant Oliver and Defendant Clark disregarded the known or obvious consequences of their actions. Facts supporting this contention are thoroughly described in allegations 246-533.

764.

Defendant Oliver's and Defendant Clark's unconstitutional customs, practices, courses of conduct and supervision caused and were a moving force behind Plaintiff's constitutional deprivations, injuries, and pain and suffering, as

Plaintiff was attacked, maimed, and stabbed by the makeshift weapons, suffered as a result of short staffing and a failure to conduct sufficient security rounds, and suffered as a result of delayed medical treatment, among other things.

765.

The U.S. Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

766.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

767.

It is well established that "confinement in a prison where violence and terror reign is actionable*." Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (citing *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

768.

Defendant Oliver and Defendant Clark are not entitled to qualified immunity for their conduct in failing to properly staff facilities in order to prevent inmate-on-inmate violence and the free flow of contraband, failing to ensure properly conducted security rounds and wellbeing rounds, and failing to maintain facilities causing a proliferation of makeshift weapons as indicated by cases such as *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995), and others.

769.

Wherefore, Plaintiff is entitled to recover under Section 1983 against Defendant Oliver and Defendant Clark.

770.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

### COUNT XV
### Punitive Damages
### (Against Defendant Oliver, individually, Defendant Clark, individually, Defendant Adams, individually, Defendant Beasley, individually, Defendant McFarlane, individually, Defendant Snowden, individually, Defendant White,

**individually, Defendant Jones, individually, Defendant Wilson, individually, and Defendant Whitfield, individually)**

771.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-533 of the instant Complaint as if fully set forth herein verbatim.

772.

Defendant Oliver's, Defendant Clark's, Defendant Adams's, Defendant Beasley's, Defendant McFarlane's, Defendant Snowden's, Defendant White's, Defendant Jones's, Defendant Wilson's, and Defendant Whitfield's, actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against said Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

773.

Defendant Oliver's actions in enforcing and employing unconstitutional staffing policies, customs, supervision and practices with knowledge of the horrible consequences, including death, assaults, violence, and inadequate medical care which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff

to recover punitive damages against Defendant Oliver in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

774.

Defendant Clark's actions in enforcing and employing unconstitutional policies, customs, supervision and practices related to the maintenance of prison facilities with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Clark in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

775.

Defendant Adams's actions in enforcing and employing unconstitutional policies, customs, supervision, and practices related to the free flow of contraband and investigations into violence, staffing, medical care, and security practices with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the

presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Adams in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

776.

Defendant Adams's actions allowing and participating in the free flow of contraband showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Adams in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

777.

Defendant Beasley's actions in enforcing and employing unconstitutional policies, customs, supervision, and practices related to the free flow of contraband and investigations into violence, staffing, medical care, and security practices with knowledge of the horrible consequences, including death, assaults, and violence which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Beasley in an amount to be

determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

778.

Defendant Beasley's actions in being deliberately indifferent to Plaintiff's serious medical needs by waiting over four days to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Beasley in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

779.

Defendant Beasley's actions in supervising and ratifying staff and officers on duty, including Defendant Jones, in waiting over four days to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Beasley in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct

780.

Defendant Beasley's actions in retaliating against Plaintiff and placing

Plaintiff in solitary confinement for several months in unconstitutional living

conditions as described in this Complaint showed willful misconduct, wantonness,

and the entire want of care which would raise the presumption of conscious

indifference to the consequences so as to entitle Plaintiff to recover punitive

damages against Defendant Beasley in an amount to be determined in the

enlightened conscience of impartial jurors to punish, penalize, and deter said

Defendant from repeating his conduct

781.

Defendant McFarlane's actions in enforcing and employing unconstitutional

policies, customs, supervision, and practices related to the free flow of contraband

and investigations into violence, staffing, security rounds, and security practices

with knowledge of the horrible consequences, including death, assaults, and

violence which were occurring as a result of these policies, practices, and customs

showed willful misconduct, wantonness, and the entire want of care which would

raise the presumption of conscious indifference to the consequences so as to entitle

Plaintiff to recover punitive damages against Defendant McFarlane in an amount to

be determined in the enlightened conscience of impartial jurors to punish, penalize,

and deter said Defendant from repeating his conduct.

782.

Defendant McFarlane's actions in retaliating against Plaintiff and placing Plaintiff in solitary confinement for several months in unconstitutional living conditions as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant McFarlane in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

783.

Defendant Snowden's actions in retaliating against Plaintiff and placing Plaintiff in solitary confinement for several months in unconstitutional living conditions as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Snowden in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

784.

Defendant White's actions in showing deliberate indifference to Plaintiff's safety and in failing to protect Plaintiff as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant White in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating her conduct.

785.

Defendant Jones's actions in being deliberately indifferent to Plaintiff's serious medical needs by waiting over four days to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Jones in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

786.

Defendant Jones's actions in supervising and ratifying staff and officers on duty in waiting over four days to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint showed willful misconduct,

wantonness, and the entire want of care which would raise the presumption of

conscious indifference to the consequences so as to entitle Plaintiff to recover

punitive damages against Defendant Jones in an amount to be determined in the

enlightened conscience of impartial jurors to punish, penalize, and deter said

Defendant from repeating his conduct

787.

Defendant Wilson's actions in applying excessive force against Plaintiff by

spraying pepper spray in Plaintiff's cell and closing the flap as described in this

Complaint showed willful misconduct, wantonness, and the entire want of care

which would raise the presumption of conscious indifference to the consequences

so as to entitle Plaintiff to recover punitive damages against Defendant Wilson in

an amount to be determined in the enlightened conscience of impartial jurors to

punish, penalize, and deter said Defendant from repeating his conduct.

788.

Defendant Whitfield's actions in applying excessive force against Plaintiff

by spraying pepper spray in Plaintiff's cell and closing the flap as described in this

Complaint showed willful misconduct, wantonness, and the entire want of care

which would raise the presumption of conscious indifference to the consequences

so as to entitle Plaintiff to recover punitive damages against Defendant Whitfield

in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

789.

Defendant Whitfield's supervision of Defendant Wilson's application of excessive force against Plaintiff as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Whitfield in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

790.

Defendant Whitfield's actions in sitting idly by and not intervening as Defendant Wilson applied excessive force to Plaintiff as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Whitfield in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

791.

Defendant Wilson's actions in sitting idly by and not intervening as Defendant Whitfield applied excessive force to Plaintiff as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Wilson in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

792.

Defendant Wilson's actions in being deliberately indifferent to Plaintiff's serious medical needs by outright refusing to help Plaintiff get his bandages changed as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Wilson in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

793.

Defendant Whitfield's actions in being deliberately indifferent to Plaintiff's serious medical needs by outright refusing to help Plaintiff get his bandages changed as described in this Complaint showed willful misconduct, wantonness,

and the entire want of care which would raise the presumption of conscious

indifference to the consequences so as to entitle Plaintiff to recover punitive

damages against Defendant Whitfield in an amount to be determined in the

enlightened conscience of impartial jurors to punish, penalize, and deter said

Defendant from repeating his conduct.

794.

Defendant Whitfield's actions in supervising and ratifying of Defendant

Wilson being deliberately indifferent to Plaintiff's serious medical needs by

outright refusing to help Plaintiff get his bandages changed as described in this

Complaint showed willful misconduct, wantonness, and the entire want of care

which would raise the presumption of conscious indifference to the consequences

so as to entitle Plaintiff to recover punitive damages against Defendant Whitfield

in an amount to be determined in the enlightened conscience of impartial jurors to

punish, penalize, and deter said Defendant from repeating his conduct.

795.

Defendant Whitfield's actions in retaliating against Plaintiff as described in

this Complaint showed willful misconduct, wantonness, and the entire want of care

which would raise the presumption of conscious indifference to the consequences

so as to entitle Plaintiff to recover punitive damages against Defendant Whitfield

in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

796.

Defendant Wilson's actions in retaliating against Plaintiff and placing feces on Plaintiff's food tray as described in this Complaint showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiff to recover punitive damages against Defendant Wilson in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter said Defendant from repeating his conduct.

797.

Defendant Oliver, Defendant Clark, Defendant Adams, Defendant Beasley, Defendant McFarlane, Defendant Snowden, Defendant White, Defendant Jones, Defendant Wilson, and Defendant Whitfield acted with the specific intent to cause harm in that said Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

798.

Wherefore, Plaintiff is entitled to recover punitive damages against Defendant Oliver, Defendant Clark, Defendant Adams, Defendant Beasley, Defendant

McFarlane, Defendant Snowden, Defendant White, Defendant Jones, Defendant Wilson, and Defendant Whitfield as determined by the enlightened conscience of impartial jurors.

## COUNT XVI
## Negligence And Gross Negligence
## Liability Pursuant to O.C.G.A. § 50-21-20 et. seq
## (Against Defendant Georgia Department of Corrections)

799.

Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-147 of the instant Complaint as if fully set forth herein verbatim.

800.

Warden Jacob Beasley, Correctional Lieutenant Zecheriah Jones, and other officers and employees owed a duty to Plaintiff not to expose him to unreasonable risks of harm, and not to violate the written policies of the Smith State Prison and the Georgia Department of Corrections with reckless disregard.

801.

Warden Jacob Beasley, Correctional Lieutenant Zecheriah Jones, and other officers and employees owed a duty to Plaintiff to treat him humanely, provide him with necessary medical care, and ensure his safety and health.

802.

Page **226** of **234**

Warden Jacob Beasley, Correctional Lieutenant Zecheriah Jones, and other officers and employees breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Smith State Prison as well as the GDC with reckless disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

a. Waiting at least 4 days to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint.

b. Failing to follow the GDC policies and procedures on the provision of medical care including but not limited to Evaluation Services for Urgent and Emergent Healthcare Requests (507.04.39) and Urgent and Emergent Care Services (507.04.37).

803.

Warden Jacob Beasley, Correctional Lieutenant Zecheriah Jones, and other officers and employees failed to exercise even a slight degree of care and had such a lack of diligence that even careless people are accustomed to exercise when they waited at least 4 days to take Plaintiff to the hospital for his life-threatening injuries as described in this Complaint when Plaintiff was previously unconscious for days, bleeding out of open wounds, and displaying obvious signs of a traumatic head injury.

804.

Warden Jacob Beasley's, Correctional Lieutenant Zecheriah Jones's, and other officers' and employees' negligence and gross negligence proximately and in fact caused Plaintiff to suffer from worse medical injuries due to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

805.

Warden Jacob Beasley is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because his tortious acts were ministerial in nature, and Warden Jacob Beasley performed them negligently.

806.

Correctional Lieutenant Zecheriah Jones is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because his tortious acts were ministerial in nature, and Correctional Lieutenant Zecheriah Jones performed them negligently.

807.

The other officers and employees who failed to provide medical care to Plaintiff after his attack are not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein

because their tortious acts were ministerial in nature, and those officers and employees performed them negligently.

808.

Defendant GDC and the State of Georgia are liable to Plaintiff for the negligence and gross negligence of Warden Jacob Beasley, Correctional Lieutenant Zecheriah Jones, and other officers and employees, which were committed in in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

809.

Correctional Unit Manager Whitfield and Correctional Officer Wilson owed a duty to Plaintiff not to expose him to unreasonable risks of harm, and not to violate the written policies of the Smith State Prison and the Georgia Department of Corrections with reckless disregard.

810.

Correctional Unit Manager Whitfield and Correctional Officer Wilson owed a duty to Plaintiff to treat him humanely, provide him with necessary medical care, and ensure his safety and health.

811.

Correctional Unit Manager Whitfield and Correctional Officer Wilson breached their duties to Plaintiff when they exposed Plaintiff to unreasonable risks of harm and violated the written policies of Smith State Prison as well as the GDC with reckless disregard and were negligent in the performance of their ministerial duties. Such negligence includes but is not limited to:

   a. Refusing to take Plaintiff to the medical wing or otherwise help effectuate bandage changes when it was clear that Plaintiff needed bandage changes while in solitary confinement as described in this Complaint.

   b. Failing to follow the GDC policies and procedures on the provision of medical care.

### 812.

Correctional Unit Manager Whitfield and Correctional Officer Wilson failed to exercise even a slight degree of care and had such a lack of diligence that even careless people are accustomed to exercise when they refused to take Plaintiff to the medical wing or otherwise help effectuate bandage changes when it was clear that Plaintiff needed bandage changes while in solitary confinement as described in this Complaint.

### 813.

Correctional Unit Manager Whitfield's and Correctional Officer Wilson's negligence and gross negligence proximately and in fact caused Plaintiff to suffer from worse medical injuries due to delayed medical treatment, suffer from prolonged physical and mental pain and suffering, and suffer from delayed recovery, among other things.

814.

Correctional Unit Manager Whitfield is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because his tortious acts were ministerial in nature, and Correctional Unit Manager Whitfield performed them negligently.

815.

Correctional Unit Manager Whitfield is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because he performed such acts with malice and an intent to injure.

816.

Correctional Officer Wilson is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because his tortious acts were ministerial in nature, and Correctional Officer Wilson performed them negligently.

817.

Correctional Officer Wilson is not entitled to official immunity as a public officer or employee with respect to the negligence and gross negligence described herein because he performed such acts with malice and an intent to injure.

818.

Defendant GDC and the State of Georgia are liable to Plaintiff for the negligence and gross negligence of Correctional Unit Manager Whitfield and Correctional Officer Wilson which were committed in in the course and scope of their employment and in the course and scope of their official duties, and are liable for such torts in the same manner as a private individual or entity would be liable under like circumstances pursuant to the Georgia Tort Claims Act.

819.

As a result of the wrongful conduct described above, Plaintiff suffered from permanent injuries, disfiguring injuries, physical and mental pain and suffering, extreme mental and emotional distress, humiliation, shock, and fright, medical bills, violations of constitutionally protected rights, lost capacity to earn, and other general and special damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for damages and request from the Court:

a.  That summons and process issue as required by law;

b.  To allow a trial by jury on all issues so triable;

c.  That judgment issue in favor of Plaintiff and against Defendants on all counts of Plaintiff's Complaint;

d.  To award Plaintiff compensatory damages against all Defendants;

e.  To grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

f.  That judgment issue in favor of Plaintiff and against Defendants awarding the Plaintiff general, special, and compensatory damages, including but not limited to physical and mental pain and suffering, extreme mental distress, medical bills, lost capacity to earn, and other necessary expenses in an amount to be proven at trial;

g.  That judgment issue in favor of Plaintiff and against Defendant Oliver, Defendant Clark, Defendant Adams, Defendant Beasley, Defendant McFarlane, Defendant Snowden, Defendant White, Defendant Jones, Defendant Wilson, and Defendant Whitfield awarding Plaintiff punitive damages in an amount determined at trial by the enlightened conscience of a fair and impartial jury; and

h.  To award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 31st day of March, 2025.

**ERIC J. HERTZ, P.C.**

By:   */s/ Eric J. Hertz*
      ERIC J. HERTZ
      GA State Bar No. 349501
      *hertz@hertz-law.com*
      ALEX S. HERTZ
      Georgia Bar No. 420971
      *alex@hertz-law.com*

*Counsel for Plaintiff*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Tel: (404) 577-8111
Fax: (404) 577-8116

**EXHIBIT A**

# ERIC J. HERTZ, P.C.
## *Trial Lawyers*

March 28, 2024

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6108**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 1588 2482**
Risk Management Division
Department of Administrative Services
200 Piedmont Avenue, SE, Suite 1804
West Tower, Atlanta, Georgia 30334
**Attention: Susan Setterstrom**
Assistant Director and Claims Counsel
And sent via
Email: Susan.Setterstrom@doas.ga.gov

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6092**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 1588 2460**
Georgia Department of Corrections
Upshaw Hall, 300 Patrol Road
Forsyth, GA 31029

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6177**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 1588 2471**
Georgia Department of Corrections
**Department Headquarters**
7 MLK Jr Drive, Suite 543
Atlanta, Georgia 30334

**VIA Certified U. S. MAIL,**
**Statutory Overnight Delivery**
**Return Receipt No.: 7021 1970 0000 3980**
**6184**
**Fed Ex Overnight Delivery**
**Return Receipt No.: 8182 1588 2450**
Warden Jacob Beasley
Smith State Prison
P.O. Box 726
Glennville, GA 30427

**RE:**  **NOTICE OF CLAIM /ANTE-LITEM NOTICE & SETTLEMENT DEMAND**
**PURSUANT TO O.C.G.A. § 50-21-26**

| | |
|---|---|
| **Our Client:** | **Troy Castleberry** |
| **Defendants:** | **Georgia Department of Corrections; Smith State Prison; Smith State Prison Warden; Brian Adams; Jacob Beasley; and officers and assailants unknown to Plaintiffs at this time.** |
| **Incident Date:** | **April 02, 2023** |
| **Loss Date:** | **April 02, 2023** |
| **Amount of Loss:** | **$3,000,000.00 Total (One Million Dollars for Release of Claims against State of Georgia and $2,000,000 for Release of claims against individual defendants in their individual capacities)** |
| **Location:** | **Smith State Prison** |
| **Extent of Injury:** | **Pain and Suffering, general and special damages, and Deprivation of Constitutional Rights** |

Page **1** of **8**

| | |
|---|---|
| **Legal Claims:** | **Violations of 42 U.S.C. § 1983, deliberate indifference, violations of Americans with Disability Act, *Monell* and *Canton* claims for training, discipline, supervision, federal and state-law claims for personal injuries, negligence, cruel and unusual punishment, mental and physical pain and suffering, punitive damages, attorney's fees, and costs of litigation.** |
| **Smith State Prison Officers:** | **Brian Adams, Warden,**<br>**Jacob Beasley, Warden,**<br>**Officers unknown to Plaintiff at this time** |
| **Entities:** | **GEORGIA DEPARTMENT OF CORRECTIONS** |

Dear Sir or Madam:

Our law firm, along with Benjamin Crump, PLLC, represents Plaintiff Troy Castleberry. Troy Castleberry was in the custody of the Smith State Prison when he was brutally attacked on or about April 02, 2023, by a large group of inmates. Because Mr. Castleberry's attack is subject to an open investigation, Plaintiff has only been able to receive limited information about the circumstances surrounding this incident. However, through communications with witnesses, medical records, a video of the attack filmed by the attackers, and the surrounding controversies publicized about Smith State Prison as well as the Georgia Department of Corrections, it is clear that Mr. Castleberry suffered pain and suffering, serious and permanent medical injuries and disfigurement, and deprivations of constitutional rights as a result of the wrongful conduct of the defendants. This letter hereby serves as Notice of Claim pursuant to O.C.G.A. § 50-21-26 for the injuries Troy Castleberry suffered due to the negligence, constitutional violations, and other tortious conduct described herein. This letter constitutes a statement made in the course of efforts to settle or compromise claims and will only be admissible following judgment in Plaintiff's favor as to attorney fees.

Mr. Castleberry was serving a sentence in Smith State Prison. Mr. Castleberry was only in Smith State prison for a short time before the attack. Due to the nature of the on-going investigations at Smith State Prison—and the ongoing investigation into the attack of Mr. Castleberry—limited information was provided to Plaintiff as to the circumstances surrounding the attack. Plaintiff received an incident report via an open records request, but it was very sparsely filled out. Therefore, Plaintiffs rely on other forms of information and research in providing this notice of claim. Upon information and belief, the following events occurred:

Mr. Castleberry originally transferred from Telfair State Prison to Smith State Prison because he wanted to get involved with the faith-based program as well as transitional program that Smith State prison was offering. Mr. Castleberry was in F-1 when he was attacked. On the day of the attack, the entire prison was on lockdown, but the prisoners were still roaming about the prison. Before Mr. Castleberry was attacked, he was placed in another dorm with 3 violent gang members. After this placement, Mr. Castleberry was placed in F-1 instead of being placed in

the "hole" for protection. When Mr. Castleberry went to F-1 by the officer's orders, gang members within the prison called gang members within F-1 to attack Mr. Castleberry. Just prior to the attack, Mr. Castleberry was on the phone with his girlfriend when he was approached by another inmate who asked him to come to room 114 after he got off the phone. After Mr. Castleberry got off the phone, he went up to room 114 in the F-1 dorm. There, he was hit in the back of the head and knocked out. After Mr. Castleberry was hit in the back of the head, his arms were bound behind his back, and he was mercilessly beaten by a group of inmates. One of the inmates involved actually filmed the attack with a cellular device and posted it on a social media site. In the video, one can see multiple men repeatably beating Mr. Castleberry as he is tied up. The assailants hit Mr. Castleberry multiple times in the face and neck. At one point, one of the attackers is not satisfied with the bruises and cuts on Mr. Castleberry's face, so he hits Mr. Castleberry very hard on the face until a huge laceration forms. After bludgeoning Mr. Castleberry for some time, the attackers turn him on his back and repeatably stab him with a very large makeshift knife. During this time, no correctional officers came to Mr. Castleberry's aid. The next memory that Mr. Castleberry recalls is that he awoke in room 122 of the F-1 dorm, with intense pain and wounds all over his body. Importantly, prison officials were aware of the dangers associated with placing Mr. Castleberry in the dorm with dangerous gangs who wanted to harm him.

Despite the brutal nature of the attack, it took around a week for the prison to take Mr. Castleberry to a hospital. In fact, in the investigative report Plaintiff received from the Open Records Request, Smith State Prison classifies the attack as not an incident where an inmate incurred "serious injury". Moreover, in Mr. Castleberry's HPI conducted by Natalie Britt, M.D., at Evans Memorial Hospital, she noted that "Prison personnel reported that he was transported to another facility for medical care, though they are unsure where and the medical staff was unable to locate any record of transfer. he arrives with multiple bandages over the wounds on his back, which are in various stages of healing. None of the wounds have staples or sutures." Later in the "Medical Decision Making" part of the medical record, Dr. Britt also opines that "Whether he was seen at another facility immediately after his assault for treatment is unclear".

When Mr. Castleberry finally was taken to Evans Memorial Hospital, he complained of problems with vision in his left eye, headache, dizziness, anisocoria, and pain generally. He told medical providers that he was attacked a week prior to the visit by men with weapons and fists and that he remained "unconscious for days" after the attack. After the providers examined Mr. Castleberry and ran some diagnostic tests, it was revealed he suffered from acute bilateral nose fractures, large acute post-traumatic left orbital medial wall blowout fracture with approximate 1.15 cm extension into the medial fractured left ethmoid air cells, acute approximate 4.5 mm depressed left orbital floor fracture, slightly acute post-traumatic depressed left nasal bone fracture, age indeterminate non-depressed right nasal bone fracture, large left frontal hemosinus and diffuse hemosinus throughout the non-compressed left ethmoid air cells, small hemosinus within the left maxillary sinus, moderate sized remote appearing right orbital medial wall blowout fracture, small acute avulsion fracture deformity of the anterior nasal spine, mild left lateral anterior bony nasal septal deviation, generalized diffuse soft tissue swelling about the left orbital, left nasal and left premaxillary soft tissue region, small acute avulsion fracture deformity of the anterior nasal sinus, ossification of the anterior longitudinal ligament noted at C4-5, C5-6, and C6-7, mild anterior spondylosis noted at C5-6 and C6-7, head trauma, sinus infection, right eye with subconjunctival hemorrhage, anisocoria with left eye larger than right eye, superficial laceration to left cheek, 8

stab wounds of the upper back on the right left, and middle, abrasion and swelling of head area, and tenderness in neck and back. New injuries associated with the attack continue to be discovered in later appointments and the injuries described above by no means constitute an exhaustive list. Mr. Castleberry will continue to suffer additional injuries associated with the attack in the future. Castleberry spent approximately 1 week in the hospital after the attack.

Mr. Castleberry eventually saw an eye specialist for his injuries. He was told by the specialist that his left retina was damaged and needed to undergo surgery. He was almost entirely blind in his left eye.

After his visit at Evans Memorial Hospital, Mr. Castleberry was discharged back to Smith State Prison. There, Mr. Castleberry did not receive proper medical treatment for his injuries. Mr. Castleberry claims that while his eye and stab wounds were supposed to be changed every day, he had to beg prison officers during the week to care to them with no avail. This caused Mr. Castleberry to fear his wounds would not heal correctly. At times, prison officers would refuse his requests for bandage changes. When he missed doctors' appointments, the prison officials would not reschedule for a very long time. Mr. Castleberry attributes much of this to a shortage of medical staff. Moreover, Mr. Castleberry was not being fed properly. Mr. Castleberry claims his food and communications were taken away after the attack. Furthermore, during much of this time, the prison was on lockdown and Mr. Castleberry was not able to bathe normally. Instead, he was forced to bathe in the sink.

After the attack, Mr. Castleberry was put in the same dorm as his attackers and saw them daily. He conveyed this to his counselor Ms. Wright, but the situation did not change. Mr. Castleberry filed many grievances about his attack and the situation he was enduring. He saw illegal contraband such as knives and machetes daily.

Mr. Castleberry's injuries persisted long after the attack. As of June 8[th,] 2023, Mr. Castleberry lost over 50 pounds and could not breathe out of his left nostril. Mr. Castleberry was experiencing constant headaches, required eye surgery, and was evaluated for his mental health. Mr. Castleberry has been concerned about permanently losing his vision, which has caused him much mental anguish. Mr. Castleberry will continue to suffer physical and mental pain and suffering from this incident in the future. Mr. Castleberry will likely require serious future medical care. He may require plastic surgery to correct his deformities.

According to Mr. Castleberry, Smith State Prison is very understaffed, headcounts are not done correctly, and the prison has no control over the prison population. He claims that the prison has little division in the prison system and are intermixing gang members from rival gangs causing more violence. Mr. Castleberry also witnessed the prison doors being "popped", indicating a lack of safety and the ability of prisoners to freely roam the prison.

Mr. Castleberry's family learned of his attack through the spread of the attack video on social media. After the attack, Mr. Castleberry's family was denied visitation. Many of his family members have written grievance letters addressed to the new warden because Mr. Castleberry was not able to get the proper grievance paperwork from officials after the incident.

After the attack, Mr. Castleberry was put in solitary confinement after the hospital and stayed there for 10-11 months until he was sent to Hayes State Prison. At some point after the incident, Mr. Castleberry was again attacked and beaten by gang members. Upon information and belief, this attack was also filmed, but not posted. During this attack, Mr. Castleberry was beaten in the day room and dragged on the floor by gang members.

Leading up to the brutal attack of Mr. Castleberry, Smith State Prison as well as the Georgia Department of Corrections were engulfed in controversy for mismanagement of the prison system. Around September 2021, the United States Department of Justice launched a formal investigation into the Georgia Department of Corrections with a focus on inmate-on-inmate violence. The DOJ is investigating the GA GDC for potential constitutional violations committed against inmates. This investigation comes after the DOJ investigated the GA GDC in 2016 to determine if it was protecting LGBTQ+ inmates from sexual violence and harassment. Furthermore, the warden of Smith State Prison, Brian Adams, was arrested on February 8, 2023, for False statements and writings; concealment of facts (O.C.G.A. § 16-10-20), Violation of oath by public officer (O.C.G.A. § 16-10-1), Bribery (O.C.G.A. § 16-10-2), and under the RICO Act (O.C.G.A. § 16-14-1).

The Georgia Virtue published an article on February 8, 2023, entitled "Brian Adams, Warden at Smith State Prison in Glennville, Arrested by GBI," by Jessica Szilagyi. This article reported the following:

- "Adams has been Warden at Smith State Prison, one of the state's most dangerous facilities, since October 2019. Since he took the helm at the prison, the facility has experienced a steady decline. Violence has skyrocketed and conditions for inmates inside have deteriorated at an unprecedented rate. Simultaneously, assaults on staff have increased with little to no disciplinary action taken against offenders. Staffing for the facility remains at an all-time low with some shifts having just one correctional officer to manage all of the dorms alone."

- "… in 2021, the GBI exposed an entire criminal enterprise operating from behind the walls of Smith State Prison. The revelations came about in a court hearing related to the case against individuals charged in the murder of 88-year-old Bobby Kicklighter of Glennville. At that time, agents revealed that the murder was actually a botched murder-for-hire plot meant for a Smith SP corrections officer. Inmates believed the C.O., who was aggressive on contraband, lived in a house next door to Kicklighter. Authorities now say the alleged hit man 'hit' the wrong house, however, taking the life of Kicklighter."

- "Months later, the criminal indictment in the same case alleged that some of the same parties were responsible for another murder. The enterprise reportedly killed Jerry Lee Davis of Jesup, a husband and father of three, in his bed next to his child in mid-January 2021. Davis worked for McDaniel Supply Company which delivered to Smith SP on a weekly basis."

- "The same indictment also shed light on another aggravated assault against a Smith SP C.O., it implicated additional parties who reportedly assisted in the furtherance of the criminal enterprise, and it detailed the multi-million dollar operation in which inmates were responsible for bringing in designer shoes and clothing, diamond and gold jewelry, drugs, and other items into Smith State Prison,"

- "Despite the overwhelming amount of evidence, to include photos and videos of the items, the issues continued. Additionally, Adams remained Warden. GDC's lack of action prompted questions from a public concerned with the well-being and safety of the nearby Glennville community. Concerns only escalated as ways the prison has directly impacted the public continue on unaddressed."

Another article published by the Georgia Virtue, "Chaos at Smith State Prison Continues to Cost Tattnall Taxpayers" by Ms. Szilagyi, reported the following on the same subject matter:

- "The investigation, which has now spanned almost two years, has uncovered a multi-million dollar contraband ring led by inmates and operating from behind the walls of Smith State Prison. The investigation so far has revealed the inmates had help from former corrections officers, current corrections officers, and citizens on the outside."

- "Though, according to court testimony from GBI agents investigating the criminal enterprise, there is photographic and video evidence of inmates over several months time displaying designer clothing, cell phones, gold and diamond jewelry, drugs, and cash,– all of which are prohibited contraband items – the operations of Smith SP have yet to be scrutinized, overhauled, or even questioned."

- "While Warden Adams approved the purchase of video game consoles and flat screen televisions as rewards for inmates, the Smith SP facility itself is seemingly overrun with pests, rodents, and filthy mold and mildew."

Inside Georgia's prisons, wave after wave of prison employees have become criminals themselves, smuggling in contraband or allowing others to do it and at times pocketing payoffs in the thousands. The Georgia Department of Corrections (GDC) has had more than 425 cases in which their employees have been arrested since 2018 for crimes on the job. Some were charged with brutality, extortion or sexual assault. At least 360 of those cases involved contraband. Some of those employees were paid thousands of dollars before they were caught in schemes that went on for months and even years. Prisoners have run elaborate drug-trafficking networks and cybercrime schemes as well as extortion and other criminal enterprises, all with the help of the contraband supplied by dirty guards, nurses, cooks, and even high-ranking officers. The widespread corruption has fueled violence inside the prisons and at times enabled stunning crimes victimizing people on the outside. An overwhelming dynamic facing the Department of Corrections is that as fast as dirty officers are arrested, new ones take their places.

Defendants knew that Mr. Castleberry was in danger of suffering violent physical harm, yet Defendants were deliberately indifferent to this serious risk. Mr. Castleberry was forced to live in

inhumane conditions and his serious medical needs were not tended to due to the deliberate indifference of the officers at Smith State Prison. The policies, customs and actions taken by Defendants as shown above caused Mr. Castleberry to suffer permanent disfigurement, Pain and Suffering, general and special damages, and Deprivation of Constitutional Rights.

In view of the foregoing, notice is hereby provided for the following claims:

- **42 USC § 1983 CLAIM FOR VIOLATING MR. CASTLEBERRY'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT;**

- **42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE AND FAILURE TO PROTECT;**

- **42 USC § 1983 CLAIM FOR CRUEL AND UNUSUAL PUNISHMENT AND FAILURE TO INTERVENE TO PREVENT CIVIL RIGHTS VIOLATIONS;**

- **42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS;**

- **42 U.S.C. § 1983 (Monell Liability) CLAIM;**

- **42 USC § 1983 CLAIM FOR WRONGFUL DEATH AS A RESULT OF DEPRIVATIONS OF CONSTITUTIONAL RIGHTS;**

- **DEFENDANTS HAVE ENGAGED IN A CUSTOM AND POLICY THAT OBSCURES THE LEVEL OF HARM EXISTENT BY IGNORING VIOLENCE AND OR INACCURATELY CLASSIFYING VIOLENT ACTS AND CAUSES OF DEATH THAT OCCUR IN SMITH STATE PRISON;**

- **SUPERVISORY LIABILITY (Canton Liability) CLAIM;**

- **VIOLATIONS UNDER THE AMERICANS WITH DISABILITIES ACT; and**

- **STATE-LAW CLAIMS FOR NEGLIGENCE, PERSONAL INJURY, PAIN AND SUFFERING, and otherwise tortious activity.**

## OFFER TO COMPROMISE CLAIMS

This is a one-time, time-limited offer to settle this matter. In exchange for the tender of Three-Million Dollars ($3 Million) total Plaintiff will release all claims against the above-named Defendants and their employees and agents. Specifically, Plaintiff seeks $1 Million for the release

of his claims against the State of Georgia and $2 Million for the release of claims against individuals in their individual capacities,

This is a straightforward case of clear liability with wanton and indifferent conscious-shocking conduct for which a jury will no doubt determine requires severe financial penalty. You have ninety (90) days to accept this offer. If this offer is not timely accepted, our clients will file suit and seek a judgment for these claims in an amount that far exceeds this demand.

Very truly yours,

ERIC J. HERTZ, P.C.

Jesse A. Van Sant, Esq.

Encs.
JVS/jdh